*Supreme Court, Appellate Division*
*Third Judicial Department*

Decided and Entered:  July 14, 2016                    106095
_____

THE PEOPLE OF THE STATE OF
    NEW YORK,
                    Respondent,

        v                                    MEMORANDUM AND ORDER

JAMES E. LAWRENCE, Also Known
    as BLACK,
                    Appellant.
_____

Calendar Date:  May 24, 2016

Before:  Lahtinen, J.P., McCarthy, Garry, Clark and Mulvey, JJ.

_____

        Mitch Kessler, Cohoes, for appellant.

        P. David Soares, District Attorney, Albany (Michael C.
Wetmore of counsel), for respondent.

_____

Mulvey, J.

        Appeal from a judgment of the County Court of Albany County
(Lynch, J.), rendered May 24, 2013, upon a verdict convicting
defendant of the crimes of burglary in the first degree (two
counts), robbery in the first degree and robbery in the second
degree (two counts).

        In June 2012, defendant was charged in a five-count
indictment with burglary in the first degree (two counts),
robbery in the first degree and robbery in the second degree (two
counts) after he and three other individuals — Shaun Green,
Nakeya Rodriguez and Antoine Daniels — allegedly entered the home
of 86-year-old Fred Freije (hereinafter the victim) and beat and
robbed him.  Following a jury trial, defendant was convicted as

charged and was thereafter sentenced, as a second felony offender, to concurrent prison terms of 15 years with five years of postrelease supervision. Defendant now appeals, and we affirm.

Defendant initially argues that the jury verdict was against the weight of the evidence. Specifically, defendant contends that the only direct evidence implicating him in the crimes came from the uncorroborated accomplice testimony of Rodriguez and Daniels, that the testimony of Andrea Lorenzo only established defendant's consciousness of guilt and that there was no proof that a black face mask recovered from among the stolen items had been worn by him during the robbery.[1] In determining whether a conviction is against the weight of the evidence, we look first at all the credible evidence and, if a different finding would not have been unreasonable, then, "like the trier of fact below, [we] weigh the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony" (People v Bleakley, 69 NY2d 490, 495 [1987] [internal quotation marks and citation omitted]; see People v Hebert, 68 AD3d 1530, 1531 [2009], lv denied 14 NY3d 841 [2010]). Based on the weight of the credible evidence, we then decide if the jury was justified in finding the defendant guilty beyond a reasonable doubt (see People v Danielson, 9 NY3d 342, 348 [2007]). In such analysis, we must "determine whether all the elements of the charged crimes were proven beyond a reasonable doubt" (People v Reeves, 124 AD3d 1068, 1068 [2015], lv denied 25 NY3d 1076 [2015]; see People v Gibson, 118 AD3d 1157, 1159 [2014], lv denied 23 NY3d 1062 [2014]; People v Hebert, 68 AD3d at 1531). Finally, we evaluate the evidence in a neutral light and "accord deference to the jury's resolution of the credibility issues involved, given its opportunity to view the witnesses and observe their demeanor throughout this process" (People v Shoemaker, 119 AD3d 1073, 1074-1075 [2014], lv denied 25 NY3d 992 [2015]; see People v Phelan, 82 AD3d 1279, 1282 [2011], lv denied 17 NY3d 799 [2011]).

---

[1] Rodriguez pleaded guilty to burglary in the third degree and Daniels pleaded guilty to burglary in the second degree. Lorenzo was never charged with a crime related to this incident.

As relevant here, "[a] person is guilty of burglary in the first degree when he [or she] knowingly enters or remains unlawfully in a dwelling with intent to commit a crime therein" and when "he [or she] or another participant in the crime . . . [c]auses physical injury to any person who is not a participant in the crime" or "[u]ses or threatens the immediate use of a dangerous instrument" (Penal Law § 140.30 [2], [3]). Further, "[a] person is guilty of robbery in the first degree when he [or she] forcibly steals property and when, in the course of the commission of the crime . . ., he [or she] or another participant in the crime . . . [u]ses or threatens the immediate use of a dangerous instrument" (Penal Law § 160.15 [3]). Pursuant to Penal Law § 160.10 (2) (a), "[a] person is guilty of robbery in the second degree when he [or she] forcibly steals property and when[,] . . . [i]n the course of the commission of the crime or of immediate flight therefrom, he [or she] or another participant in the crime . . . [c]auses physical injury to any person who is not a participant in the crime." To prove that an individual is guilty of robbery in the second degree pursuant to Penal Law § 160.10 (1), the People must establish that "he [or she] forcibly steals property and . . . [h]e [or she] is aided by another person actually present." "A person forcibly steals property when he or she uses or threatens the immediate use of physical force upon another person for the purpose of . . . compelling the owner of such property . . . to deliver up the property" (People v Myrick, 135 AD3d 1069, 1070 [2016] [internal quotation marks and citation omitted]; see People v Gordon, 23 NY3d 643, 649-650 [2014]; People v Griffin, 122 AD3d 1068, 1069 [2014], lv denied 25 NY3d 1164 [2015]).

At trial, Rodriguez testified that, on June 14, 2012, she, along with Green, Daniels and defendant, went to the victim's home to rob him. According to Rodriguez, it was Lorenzo's idea to rob the victim, and the scheme was discussed with the other participants at Lorenzo's home earlier that day. Rodriguez testified that, at approximately 11:00 p.m., she, Green, Daniels and defendant left Lorenzo's home and headed to the victim's home, where Rodriguez knocked at the victim's back door and asked him if she could use his phone and then his bathroom. When the victim opened his door, Green forced his way into the home, with Rodriguez, Daniels and defendant following. While Rodriguez was

in the victim's home, she observed Green hitting the victim with a BB gun and with his hand.  Ultimately, the safe in the victim's home was opened and its contents removed.  The perpetrators left the victim's home with bags of the victim's property, some of which contained coins from the victim's coin collection.  According to Rodriguez, the group then returned to Lorenzo's home, where, in a second floor bathroom, Rodriguez, Green, Daniels and defendant split the stolen property.  Thereafter, Green and Daniels left and Rodriguez and defendant stayed at Lorenzo's house overnight.  The next morning, Rodriguez called Kelli Lord, her cousin who resides across the street from Lorenzo, and asked her to hold some of the stolen property.  Rodriguez also testified that when the police arrived at Lorenzo's home that morning, defendant took one of the bags containing stolen coins and placed it in the basement.

Lorenzo testified that Green, Rodriguez, Daniels and defendant were at her home on June 14, 2012.  Lorenzo denied being involved in the burglary plans, testifying that the group sat outside on her porch and that she was unable to hear what they were discussing.  According to Lorenzo, at approximately 10:30 p.m., Rodriguez, Green, Daniels and defendant left and, when they returned approximately an hour to an hour and a half later, they were "in an uproar."  Rodriguez had a brown, pleather bag containing jewelry and other items, and defendant had a book bag with him.  Lorenzo stated that there were also additional bags of coins and other odds and ends and that, when Green and Daniels returned, the four went into the bathroom with "a bunch of stuff."  Lorenzo testified that, at some point, Rodriguez informed her that the group had just robbed someone, that Green had "pistol-whipped" the victim and that they were scared that they were in trouble.  Thereafter, Green and Daniels left, each taking a bag, and defendant and Rodriguez spent the night.  When the police arrived at Lorenzo's home the next day, she informed the police that defendant had taken a bag down to her basement.  Testimony from a crime scene technician with the State Police noted that evidence confiscated from Lorenzo's home pursuant to a search warrant included, among other things, a plastic bag from a basement utility room, which contained numerous coins.

Daniels testified that he, Rodriguez, Green and defendant

discussed burglarizing a home, and the group went to the victim's home to carry out their plan. His testimony was substantially consistent with Rodriguez's testimony regarding the entry into the victim's home. Daniels testified that while he was in the victim's home, he could hear the victim being hit repeatedly and he observed Green holding the victim and striking him with a fake gun. Green was asking the victim for a combination or a key to a safe, and defendant was encouraging Green, saying "hit him, hit him again." The group was in the home for a total of 30 or 45 minutes, and Daniels did not recall anyone wearing anything on his or her face during the home invasion.

Lord testified that, the morning after the burglary, Rodriguez called her and asked her to store some items. Thereafter, Jodnee Robinson, an acquaintance of Rodriguez and Lorenzo, brought the bags across the street to Lord's home. Lord then called the police and turned the bags over to them. Jason Johnston, a police detective, retrieved the bags from Lord's home and observed, among other things, a black foam ski mask in one of the bags, as well as paperwork that contained the victim's name and collectible coins. Another bag, described by Johnston as a brown canvas purse, also contained collectible coins. Johnston testified that the victim informed the police that he was familiar with one of the perpetrators, later identified as Rodriguez. Also, the victim, who called 911 after the incident, stated to the 911 operator that the perpetrators had "things over their nose, over their chin." Testimony further established that the victim's coin collection had been taken during the burglary.

Kristine Robinson, a forensic scientist with the State Police Forensic Investigation Center, testified that she performed examinations on various items related to the instant crime, including buccal swabs from defendant, and performed an analysis on the black face mask. She testified that defendant's DNA profile was the major contributor on the mask, both inside and outside, with one additional donor to the inside and two additional donors to the outside. Her statistical analysis determined that the probability of collecting an unrelated individual comparing defendant's buccal swab with the mask that matches the major contributor is less than one in three hundred billion.

"'While accomplice testimony must be corroborated with independent evidence, such evidence does not have to be substantial as it need not establish the elements of the offense; instead, it is sufficient if it tends to connect the defendant to the crime, thereby assuring the jury that the accomplice has offered credible probative evidence'" (People v Burns, 68 AD3d 1246, 1247 [2009], lv denied 14 NY3d 798 [2010], quoting People v Harrison, 251 AD2d 893, 894 [1998], lv denied 92 NY2d 949 [1998]; see People v Gilbo, 52 AD3d 952, 953 [2008], lv denied 11 NY3d 788 [2008]).  Lorenzo's testimony supplied the requisite corroboration for defendant's participation in the crimes, as it placed defendant at her home with the other perpetrators before and after the alleged crimes, and her testimony inferred that defendant was in possession of and attempted to conceal the stolen property while at her home (see People v Burns, 68 AD3d at 1247-1248).  In addition, defendant's DNA was discovered on the face mask that was among the stolen items recovered, and, according to the victim's statements to 911, the perpetrators were wearing something over their faces during the commission of the crimes.  Viewing the evidence in a neutral light and according deference to the jury's resolution of credibility issues, we are satisfied that the verdict is not against the weight of the evidence (see People v Oliver, 135 AD3d 1188, 1190-1191 [2016], lv denied 27 NY3d 1003 [2016]; People v Gamble, 135 AD3d 1078, 1078-1080 [2016], lv denied 27 NY3d 997 [2016]; People v Allen, 132 AD3d 1156, 1157-1158 [2015], lv denied 26 NY3d 1107 [2016]).

Defendant also contends that he was denied the effective assistance of counsel – a claim premised upon his counsel's failure to request an accomplice-in-fact jury instruction for Lorenzo and to object to the prosecutor's purported misrepresentations during his summation of the People's DNA expert's conclusions.  "To establish a claim of ineffective assistance of counsel, defendant 'is required to demonstrate that he was not provided meaningful representation and that there is an absence of strategic or other legitimate explanations for counsel's allegedly deficient conduct'" (People v Ramos, 133 AD3d 904, 909 [2015], lvs denied 26 NY3d 1143, 1149 [2016], quoting People v McRobbie, 97 AD3d 970, 972 [2012], lv denied 20 NY3d 934 [2012]).  Defendant must meet the "high burden" (People v Garcia,

131 AD3d 732, 735 [2015] [internal quotation marks and citation omitted], lv denied 27 NY3d 997 [2016]; see People v Schulz, 4 NY3d 521, 531 [2005]) of showing that counsel's decision to not request an accomplice-in-fact jury instruction "could not have been grounded in a legitimate trial strategy" (People v McGee, 20 NY3d 513, 518 [2013]; see People v Alls, 117 AD3d 1190, 1192 [2014]; People v Izzo, 104 AD3d 964, 967 [2013], lv denied 21 NY3d 1005 [2013]).

Although defendant would have been entitled to an accomplice-in-fact jury instruction given Rodriguez's testimony as to Lorenzo's complicity in planning the home invasion, defendant has not sufficiently shown that there was no legitimate trial strategy behind the decision not to request such instruction — particularly in light of defense counsel's theme throughout the trial and during summation that Rodriguez, who had received a favorable plea bargain in exchange for her testimony against defendant, had falsely implicated defendant in an attempt to "ensnare other people to take responsibility for her actions" and, as a result, her testimony was not to be believed. Also unavailing is defendant's argument that his counsel's failure to object to the People's mischaracterization of the DNA evidence denied him meaningful representation. In his summation, the prosecutor argued that the face mask "was a DNA match," and that "it was this defendant's DNA — nobody else's DNA . . . in the blackface mask in the middle of June." Although the latter statement was technically inaccurate — as the testimony at trial related that defendant was the major contributor of the DNA profile on the face mask and that it was admixed with additional donors — we do not find, under these circumstances, that the misrepresentation was so egregious or misleading that defense counsel's failure to object constituted ineffective assistance so as to deprive defendant of a fair trial (see People v Elwood, 80 AD3d 988, 990 [2011], lv denied 16 NY3d 858 [2011]; People v Albanese, 38 AD3d 1015, 1018-1019 [2007], lv denied 8 NY3d 981 [2007]).

Lahtinen, J.P., McCarthy, Garry and Clark, JJ., concur.

ORDERED that the judgment is affirmed.


ENTER:

Robert D. Mayberger
Clerk of the Court