People v Decker (2023 NY Slip Op 03950)

People v Decker

2023 NY Slip Op 03950

Decided on July 27, 2023

Appellate Division, Third Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered:July 27, 2023

112140
[*1]The People of the State of New York, Respondent,
v
David J. Decker, Appellant.

Calendar Date:June 6, 2023

Before:Egan Jr., J.P., Aarons, Ceresia, Fisher and McShan, JJ.

Lippes Mathias LLP, Albany (Karl J. Sleight of counsel), for appellant.
Jason M. Carusone, District Attorney, Lake George (Benjamin R. Smith of counsel), for respondent.

McShan, J.
Appeals (1) from a judgment of the County Court of Warren County (John S. Hall Jr., J.), rendered September 9, 2020, upon a verdict convicting defendant of the crimes of grand larceny in the second degree, scheme to defraud in the first degree and offering a false instrument for filing in the first degree (four counts), and (2) from an order of said court, entered November 19, 2020, which set the amount of restitution owed by defendant.
In 2001, the Lake George Watershed Coalition (hereinafter LGWC) was created to administer grants provided from the Department of State (hereinafter DOS) to certain municipalities located near Lake George to meet the overall mission of preserving the lake. LGWC was comprised of several municipalities as well as other nonprofit entities in the region and, shortly after its formation, defendant was named its executive director. The grants were administered in accordance with a two-tiered contract structure, wherein LGWC would contract with the various municipal entities comprising the LGWC to complete certain projects in furtherance of its purpose, and the municipal entities, would submit, pursuant to individual contracts, for reimbursement from DOS. The invoices and records that were submitted to DOS were prepared by defendant in his capacity as the director of LGWC. In this respect, defendant was responsible for the completion of the projects and would seek reimbursement on behalf of LGWC for payments made to various subcontractors that he contracted with to perform the work on certain projects. Defendant also submitted invoices for reimbursement of the salary that he received personally for his professional services to LGWC. In order to facilitate this process, defendant set up a bank account for LGWC at Ballston Spa National Bank (hereinafter BSNB), where he also had two personal accounts and an account for his for-profit business, Empire Allstars, through which he ran youth basketball competitions. Defendant filed a "doing business as" (hereinafter d/b/a) certificate for LGWC in 2003. Defendant also established a d/b/a for Empire Allstars in 2006 and for a business called Empire State Equipment and Supply Company (hereinafter Empire State Equipment) in 2000.
DOS commenced an audit in 2014 pertaining to its 11 contracts with various municipalities receiving grant funding, 10 of which involved defendant and LGWC. The audit raised concerns about defendant's financial practices, which prompted investigators to issue two subpoenas to BSNB, one in September 2016 and another in November 2017. In response to the subpoenas, BSNB disclosed defendant's bank records to the Warren County District Attorney's office in October 2016 and December 2017, respectively. Prior to the issuance of the second subpoena, certain bank and tax records were seized from defendant pursuant to a February 2017 search warrant. Defendant later moved to suppress the evidence garnered from the search and County Court scheduled a Mapp hearing. However[*2], the People represented that they did not intend to proceed with the hearing as their case did not rely on any material seized from the search warrants and, therefore, the court granted the motion.
In 2017, the matter was referred to the Office of the State Comptroller (hereinafter OSC) to analyze defendant's bank accounts and the contracts between LGWC and defendant and assess whether there was evidence of fraud or misuse of monies. OSC concluded that defendant had billed the municipalities for the same subcontractor work on multiple occasions and that he had failed to pay certain subcontractors and entities despite receiving reimbursement from the municipalities for their work or services. Further, OSC's analysis of the contracts and defendant's bank accounts led to a determination that defendant had improperly requested reimbursement from the Lake Champlain-Lake George Regional Planning Board (hereinafter the LCLG Planning Board) by submitting fraudulent invoices and invoicing for services that had already been paid through other reimbursement requests. Meanwhile, the Warren County District Attorney's office referred the matter to the Department of Taxation and Finance (hereinafter DTF) to investigate defendant's tax returns, which ultimately revealed that defendant had failed to submit schedule C forms reporting certain income that he earned from, among other things, his work with LGWC, as well as his income from Empire Allstars.
Based on the foregoing, defendant was charged by a 22-count indictment with a series of theft-related crimes. Prior to trial, the People voluntarily dismissed 14 of the 22 counts; the 8 remaining counts, in their renumbered order, charged: corrupting the government in the first degree (count 1), grand larceny in the second degree (count 2), scheme to defraud in the first degree (count 3), grand larceny in the third degree (count 4) and offering a false instrument for filing in the first degree (counts 5, 6, 7 and 8). At the conclusion of a month-long jury trial, defendant was acquitted of counts 1 and 4, but convicted of counts 2, 3, 5, 6, 7 and 8. He was sentenced to a prison term of 3 to 9 years on count 2, and prison terms of 1 to 3 years on counts 3, 5, 6, 7 and 8, with each sentence to run consecutively, resulting in an aggregate prison term of 8 to 24 years. Following a separate restitution hearing, County Court ordered defendant to pay restitution in the following sums: $77,289 to the state, $129,716 plus interest to the US Department of Agriculture (hereinafter USDA), $4,182 plus interest to the Fort William Henry Hotel and Conference Center (hereinafter FWH), $50,000 plus interest to Warren County and $53,610 plus interest to the FUND for Lake George (hereinafter the FUND). Defendant appeals from the judgment of conviction and from the order of restitution.
Defendant contends that each of his convictions is not supported by legally sufficient evidence and the verdict is against the weight of the evidence[*3]. However, although defendant moved for a trial order of dismissal at the close of the People's case, his failure to renew that motion at the end of his own case renders his legal sufficiency challenge unpreserved (see People v Abreu, 195 AD3d 1152, 1153 [3d Dept 2021], lv denied 37 NY3d 1144 [2021]), notwithstanding his subsequent motion to set aside the verdict pursuant to CPL 330.30 (1) (see People v Morris, 140 AD3d 1472, 1472-1473 [3d Dept 2016], lv denied 28 NY3d 1074 [2016]). "Nevertheless, a weight of the evidence challenge, which bears no preservation requirement, also requires consideration of the adequacy of the evidence as to each element of the crimes" (People v Truitt, 213 AD3d 1145, 1146 [3d Dept 2023] [internal quotation marks and citations omitted], lv denied 39 NY3d 1144 [2023]). In determining whether a verdict is against the weight of the evidence, we first look to whether, "based on all the credible evidence a different finding would not have been unreasonable" (People v Bleakley, 69 NY2d 490, 495 [1987]; accord People v Hardy, 57 AD3d 1100, 1102 [3d Dept 2008], lv denied 12 NY3d 784 [2009]). In assessing a defendant's contentions "where, as here, a different verdict would not have been unreasonable, this Court must, like the trier of fact below, weigh the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony" (People v Valentin, 95 AD3d 1373, 1373 [3d Dept 2012] [internal quotation marks and citations omitted], lv denied 19 NY3d 1002 [2012]; see People v Sostre, 172 AD3d 1623, 1625 [3d Dept 2019], lv denied 34 NY3d 938 [2019]). In doing so, "we view the evidence in a neutral light and . . . [give] deference to the jury's credibility determinations" (People v Lozano, 203 AD3d 1231, 1232 [3d Dept 2022] [internal quotation marks and citations omitted]; see People v Truitt, 213 AD3d at 1147).
Turning first to his conviction of grand larceny in the second degree, defendant primarily argues that the People failed to show that he illegally deprived the US Forest Service (hereinafter USFS), the LCLG Planning Board or anyone else of the $135,000 in grant funds received through the USDA, or that he appropriated that money by false or fraudulent pretenses. At trial, the People presented the testimony of Walter Young, the director of the LCLG Planning Board during the relevant time frame. According to Young, defendant raised the idea of the LCLG Planning Board applying for the USFS grant in 2007, and defendant filled out the application so that the LCLG Planning Board would receive the grant funding since LGWC was not an eligible entity. Young testified that in 2010 and 2012, defendant submitted invoices and received the requested reimbursements for payments from DOS to the Town of Queensbury, Warren County for expenses paid to subcontractors Chazen Companies and Earth Specialty Products (hereinafter ESP). To this end, Lucas Wilson, the former owner of [*4]ESP, testified that he had worked on a project near Lake George referred to as the West Brook project. Wilson was unfamiliar with the invoice that defendant sent the LCLG Planning Board in the amount of $60,560 for the delivery of topsoil by ESP and testified that he did not submit a bill for that amount to defendant nor had he been paid this amount. Wilson also noted that he was not responsible for two other invoices pertaining to topsoil delivery from Empire State Equipment that was submitted by defendant and identified Wilson as the sales representative. Further, Wilson explained that he had already been paid in full for his work on the West Brook project.
Consistent with the aforementioned testimony, Thomas Casaregola, the chief of the forensic audit unit for OSC, testified that defendant had submitted multiple invoices to the Town of Queensbury and the LCLG Planning Board in 2012, seeking reimbursement for payments he claimed to have made to ESP and Empire State Equipment for supplying topsoil. Specifically, Casaregola explained that in 2012, defendant received $60,560 from the LCLG Planning Board federal grant. However, defendant had requested and received $99,300 from the Town of Queensbury under Empire State Equipment for topsoil delivery. To this end, Casaregola's review demonstrated that only $90,080 was disbursed to ESP pertaining to topsoil delivery, leaving an excess reimbursement to defendant for purported topsoil delivery of $69,780. As to the Chazen invoices, Casaregola explained that defendant had submitted three separate invoices to the Town of Queensbury in 2009 and 2010 that contained bills for services provided by Chazen. Thereafter, defendant submitted an invoice to the LCLG Planning Board in October 2010 that matched the previously submitted invoices and subsequent payments that he had already received from the Town of Queensbury.
Similarly, in 2012, defendant submitted a request and received reimbursement from the LCLG Planning Board for a $69,156.30 payment he claimed to have made to the subcontractor Natural Restorations by Linda J. and Company, Inc. (hereinafter Linda J.). Linda Jedrysik, the owner of Linda J., testified that she worked on the West Brook project for the Town of Queensbury in 2012 and dealt with defendant as the Town's representative. According to Jedrysik, she applied to the Town for payment on the base contract in the amount of $295,555 in October 2012, and after five months was paid for the contract via wire transfer to her bank account.[FN1] Jedrysik also noted a subsequent payment for $21,271.17 pertaining to an approved change order on the project. Jedrysik also testified that she never received a payment for the $69,156.30 that defendant claimed to have paid her in an invoice sent to the LCLG Planning Board, nor did she send defendant an invoice for this amount. Casaregola similarly testified that the $69,156.30 payment defendant claimed to have made to Linda J. was not supported by an invoice and represented [*5]an amount precisely equivalent to the remaining funds left on the $135,000 grant after factoring in the reimbursement requests pertaining to Chazen and ESP.
The trial evidence sufficiently establishes that, between September 2010 and November 2012, defendant submitted invoices to the LCLG Planning Board for payments to Chazen for which he had previously requested and received reimbursement from the Town of Queensbury. Further, the evidence demonstrated that defendant requested and received reimbursement from the LCLG Planning Board based upon fabricated invoices pertaining to Empire State Equipment, ESP and Linda J. As to defendant's contention that the contract structure between him and the municipalities, which he couches as a lump-sum arrangement, entitled him to any monies received from the arrangement, such argument fails to account for the two-tier contract structure and, more specifically, his role in the contractual arrangement between the municipalities and DOS, which was testified to at trial and required that the reimbursement requests submitted to DOS be predicated on actual invoices (cf. United States v Davis, 2017 WL 3328240, *18, US Dist LEXIS 122643, *50-53 [SDNY, Aug. 3, 2017, 13-CR-923 (LAP)]; see generally United States v Evans Landscaping, Inc., 2018 WL 1794336, *3, US Dist LEXIS 63660, *7-8 [SD Ohio, Apr. 16, 2018, 1:17CR053]; People v DiCarlo, 293 AD2d 279, 280-81 [1st Dept 2002], lvs denied 98 NY2d 767 [2002]). To this end, we reject defendant's argument that this arrangement conclusively established his innocence, as he fails to identify any definitive authority in either arrangement that permitted him to submit invoices in amounts that were not actually generated by a subcontractor or for subcontractor work that had previously been paid for in its entirety through other municipalities. Further, we find that the jury was presented with sufficient evidence permitting it to reasonably infer that defendant's reimbursement requests utilizing previously paid invoices and for invoices predicated on work that was never performed were indicative of his intent to deprive the USDA of funds he was not entitled to (see People v Gibson, 118 AD3d 1157, 1158-1159 [3d Dept 2014], lv denied 23 NY3d 1062 [2014]; People v DiCarlo, 293 AD2d at 279; People v Grant, 18 AD3d 235, 236 [1st Dept 2005], lv denied 5 NY3d 762 [2005]). Altogether, viewing the evidence in a neutral light, the weight of the evidence supports defendant's conviction for grand larceny in the second degree (see Penal Law § 155.05; People v McDonnell, 201 AD3d 951, 952 [2d Dept 2022], lv denied 38 NY3d 1152 [2022]; People v Waugh, 52 AD3d 853, 854-855 [3d Dept 2008], lv denied 11 NY3d 796 [2008]).
As to his conviction for scheme to defraud in the first degree, defendant argues that the People failed to prove that he perpetrated an ongoing scheme, manifested an intent to defraud anyone or obtained property by false or fraudulent pretenses. At trial, the People presented evidence [*6]concerning four separate arrangements underlying this charge, beginning with an invoice from FWH for an event that defendant booked in 2013 for LGWC. An employee of FWH testified that LGWC incurred a $4,128.62 bill for this event, which defendant never paid, despite multiple emails to him requesting payment. The town clerk for the Town of Bolton, Warren County testified that defendant submitted an invoice containing a charge for $4,182.62 paid to FWH sometime during October 2013, and that the Town had paid defendant for this charge as part of a larger check that covered that invoice as well as others. More precisely, Casaregola testified that his review of defendant's bank accounts revealed that defendant had received reimbursement for this $4,182.62 expense from the Town of Bolton in January 2014 as part of a $25,877.66 reimbursement. However, Casaregola testified that, after depositing the funds in the LGWC bank account, he transferred $27,575 to the various other accounts that he maintained at BSNB. The trial evidence demonstrated that, despite receiving the reimbursement in 2014, defendant would respond to FWH's requests for payment by advising that the state had yet to release the funds to him to pay the bill. Despite FWH's ongoing requests for payment, the FWH bill remained outstanding at the time of trial.
For his part, defendant presented testimony from the mayor of the Village of Lake George, Warren County, who acknowledged that the Village's accountant had audited certain Village accounts, which revealed that defendant was potentially owed more than $96,000 from the Town of Bolton owing to certain unpaid invoices. However, the mayor acknowledged, and the letter reflected, that the legality of defendant's claims for reimbursement was uncertain, and that defendant had also been overpaid for certain expenses and had other outstanding bills, including for Internet service. Defendant also introduced testimony from his expert, Stephen Ferraro, a certified public accountant, who testified that the Town of Bolton owed defendant $25,144 for expenses and an unpaid invoice for professional engineering work; however, Ferraro did not testify to any specific documentation supporting these figures.
Concerning the unpaid invoice from Warren County, Robert Lynch, the deputy treasurer of Warren County, testified that he communicated with defendant regarding the reimbursement from LGWC for certain work referred to as the Finkle Brook project.[FN2] This project was interchangeably referred to as the Valley Woods Road project. Lynch explained that the total amount sought for reimbursement, after accounting for the County's share of the work, was $152,500, and that he had asked defendant to have LGWC reimburse $50,000 from the Town of Queensbury for the project in two installments. Lynch testified that Warren County received the $50,000 from LGWC and another $52,500 from the Town of Bolton, and that as of the date of Lynch's testimony, Queensbury still owed $[*7]50,000 on the project. According to Casaregola, his investigation revealed that defendant had submitted two requests for reimbursement from the Town of Queensbury for $50,000 paid to Warren County for its work on the Finkle Brook project, but his bank records showed that he only made the first payment. Further, Casaregola testified that both reimbursement requests were paid into the LGWC account by the Town of Queensbury.
As to the FUND, the trial testimony reflected that defendant had two separate contracts with the FUND for two separate services pertaining to a boat washing program to decontaminate boats being launched into the lake and protect the lake from aquatic invasive species. The FUND had a contract with LGWC, under which LGWC would reimburse the FUND for $53,610 in payments allocated for providing daytime staffing of boat washing stations through a DOS grant to the Town of Bolton, after LGWC received the necessary funds from DOS.[FN3] A separate invoice for approximately $60,331 pertained to a nighttime boat washing program. Eric Siy, the executive director for the FUND, testified that he emailed defendant in early 2015 asking that LGWC reimburse the FUND. However, when defendant did not provide a clear answer about reimbursement, Siy requested reimbursement directly from DOS. Siy conceded that he later learned that DOS had rejected the reimbursement; however, that rejection was on the basis that DOS had already paid the Town of Bolton for the work underlying the $53,610 invoice as part of a prior 2014 reimbursement. Siy's testimony reflected that the FUND remained unpaid at the time of trial.
Finally, the People submitted testimony from the former clerk and treasurer for the Village of Lake George, who testified that defendant and the Village had an arrangement which provided defendant with space in the Village's office in exchange for defendant bearing responsibility for the Village's Internet bill, and that defendant had an outstanding bill in excess of $4,000 at the time of her retirement in 2018. Consistent with that account, the current clerk confirmed that defendant owed the Village of Lake George $4,937.84 for the Internet bill as of the time of her testimony. Casaregola similarly testified that his analysis concluded that defendant had failed to pay the Village of Lake George in the amount indicated by the current clerk despite having invoiced and received reimbursement for Internet expenses from DOS through various contracts.
Defendant attributes his failure to provide these entities with timely payments to delays in reimbursement from DOS during the pendency of its audit. Further, defendant again relies on the lump-sum contract structure in asserting that he had the discretion to provide payment to subcontractors on whatever timeline he deemed appropriate. However, the jury clearly credited the testimony that defendant owed $4,182.62 to FWH, $50,000 to Warren County, $53,610 to the FUND and $4,937.84 to the Village of Lake George[*8]. Further, the evidence sufficiently established that defendant had sought and received reimbursement for these expenses but, instead of paying these entities the amounts owed, he retained the funds. The trial evidence also established that despite having received reimbursement for the aforementioned expenses, defendant informed representatives for these entities that he had yet to receive the funds needed to pay them months and years after those funds had already been deposited into the LGWC account. To the extent that defendant contends that the evidence is merely reflective of various isolated instances rather than a scheme, the jury was presented with evidence that this practice extended from 2008 until at least 2014, and its determination that defendant's actions constituted a "continuing offense committed over time" is adequately supported (People v Arbas, 85 AD3d 1320, 1322 [3d Dept 2011] [internal quotation marks and citations omitted], lv denied 17 NY3d 813 [2011]). Thus, viewing the evidence in a neutral light and deferring to the jury's credibility assessments, the verdict as to this conviction is not against the weight of evidence, as the pattern of defendant's reassurances to these various entities that payment was forthcoming, together with his coinciding misrepresentations concerning the status of DOS reimbursement, indicates that he had the necessary intent to defraud these entities (see Penal Law § 190.65 [1] [b]; People v Perillo, 144 AD3d 1399, 1402 [3d Dept 2016], lv denied 29 NY3d 951 [2017]; People v DeDeo, 59 AD3d 846, 850-851 [3d Dept 2009], lv denied 12 NY3d 782 [2009]; People v Rosado, 28 AD3d 215, 216 [1st Dept 2006]; People v Kowallis, 1 AD3d 1026, 1027-1028 [4th Dept 2003]).
Finally, as to offering a false instrument for filing in the first degree,[FN4] Defendant's contention pertaining to the jury charge for the four counts of offering a false instrument for filing in the first degree is without merit. Contrary to defendant's contention, the People were not required to prove that the state suffered a financial loss (see Penal Law § 175.35 [1]; CJI2d[NY] Penal Law § 175.35 [1]; see generally People v Park, 163 AD3d 1060, 1062 [3d Dept 2018]; People v Kase, 76 AD2d 532, 537 [1st Dept 1980], affd 53 NY2d 989 [1981]), and the charge was appropriate in light of the evidence presented at trial. Kimlee Stewart, a forensic auditor for DTF, testified that she investigated defendant's personal income tax returns for the years 2012 to 2016. Stewart testified that defendant failed to report $209,535 in schedule C income in 2012, $92,026 in personal income in 2013, $103,255 in 2014 and $38,163.05 in 2016, as he failed to submit a schedule C tax form containing his income from Empire Allstars as well as income generated from his work with LGWC. Stewart confirmed that all income earned through a business operating under a d/b/a is reportable as personal income, and that income reported through a W-2 form does not include income earned [*9]through a d/b/a. According to Stewart, defendant met with DTF in 2018, and subsequently filed amended returns for 2013, 2014 and 2016, including the addition of schedule Cs for Empire Allstars, in which he reported a net loss of $16,691.96, $34,437 and $12,128, respectively. In 2016 he also filed a schedule C for daily fantasy sports/gambling, reporting an increase in the gambling winnings he previously reported on his original 2016 return. However, in the amended return, defendant classified himself as a professional gambler, allowing him to claim a loss of $2,062. Defendant, for his part, introduced the testimony of Ferraro, who noted that the Village of Lake George had not provided defendant two necessary 1099s until 2017, nor did he receive a 1099 from the LCLG Planning Board for the $135,000 paid out from the USDA grant. The trial evidence also reflected that defendant had, in certain years, not received 1099s from the Village of Lake George.
Altogether, the evidence sufficiently supported DTF's conclusion that defendant's tax returns did not properly reflect his income for each year at issue. Further, there was sufficient evidence to conclude that defendant's nonreporting of income followed a distinct pattern — he reported income received in his name, personally or through a business designation, and omitted all income received through his three businesses. Moreover, when defendant attempted to provide amended tax returns to DTF, he altered the amount of money that he won and lost through gambling, and attempted to claim that he was a professional gambler. While the jury could have accepted defendant's representations that these errors merely reflected poor accounting practices, taken as a whole, the inconsistencies in defendant's taxes are sufficient evidence to support the jury's conclusion that he did in fact intend to defraud DTF by knowingly submitting false information regarding his income (see People v Nunez, 160 AD3d 1227, 1228-1229 [3d Dept 2018]; see generally People v Camiola, 225 AD2d 380, 381 [1st Dept 1996], lv denied 88 NY2d 877 [1996]). In this respect, the jury clearly credited Stewart's findings that defendant intentionally underreported his income over Ferraro's assertion that defendant merely made "honest mistake[s]" when filing his taxes. Altogether, viewing the evidence in a neutral light and deferring to the jury's credibility assessments, the verdict as to these convictions is not against the weight of the evidence (see Penal Law § 175.35 [1]; People v Mazzeo, 202 AD3d 1279, 1283 [3d Dept 2022], lv denied 38 NY3d 1072 [2022]; see also People v Hure, 16 AD3d 774, 775-776 [3d Dept 2005], lv denied 4 NY3d 854 [2005]).[FN5] Based upon our determination, defendant's challenge to the testimony presented to the grand jury is precluded inasmuch as the verdict is not against the weight of the evidence, "which establishes that [the convictions] were necessarily supported by legally sufficient evidence" (People v Vega, 170 AD3d 1266[*10], 1273 [3d Dept 2019], lv denied 33 NY3d 1074 [2019]; see CPL 210.30 [6]). Further, defendant's various contentions pertaining to the grand jury proceedings are without merit, as our review of the record fails to reveal any notable flaws in the proceedings, let alone any that might warrant reversal (see People v Secor, 162 AD3d 1411, 1413 [3d Dept 2018], lv denied 32 NY3d 941 [2018]; People v Robinson, 156 AD3d 1123, 1132 n 8 [3d Dept 2017], lv denied 30 NY3d 1119 [2018]).
Defendant next contends that the People did not provide him with adequate notice of the charges against him, pointing specifically to purported deficiencies in the time frames identified in four separate bills of particulars prior to trial. We are unpersuaded. Defendant's requests for further specificity or his own confusion do not render the indictment inadequate, inasmuch as the general requirement that an indictment "contain . . . a statement in each count that the offense charged therein was committed on, or on or about, a designated date, or during a designated period of time" is qualified by the exception that an approximation of the time frame is appropriate "when time is not an essential element of the crime charged" (People v Smith, 137 AD3d 1323, 1325 [3d Dept 2016] [internal quotation marks, brackets and citation omitted], lv denied 28 NY3d 974 [2016]; see People v Salmon, 179 AD3d 1404, 1405 [3d Dept 2020]). In this respect, the counts of the indictment challenged by defendant contained the relevant Penal Law provision, stated the elements of the crime charged along with an overview of the criminal conduct defendant was alleged to have committed and provided the date range pertinent to each count in which defendant allegedly committed the charged crimes (see People v Perez, 93 AD3d 1032, 1034-1035 [3d Dept 2012], lv denied 19 NY3d 1000 [2012]; see also CPL 200.50 [6]). Furthermore, the People alleged in the initial bill of particulars that, between September 2, 2008 and December 31, 2016, defendant engaged in a systematic course of conduct by intentionally defrauding FWH, Warren County, the FUND, the Village of Lake George and two other entities. Those dates did not change over the course of the People's subsequent bills of particulars. Further, time was not an element of any of the offenses and, accordingly, the foregoing disclosures in the indictment and various bills of particulars were not defective and did not deprive defendant of the opportunity to prepare his defense (see People v Salmon, 179 AD3d at 1405; People v Smith, 137 AD3d at 1325; People v Slingerland, 101 AD3d 1265, 1266 [3d Dept 2012], lv denied 20 NY3d 1104 [2013]).
We are unpersuaded that the People committed any discovery violations that require reversal. Initially, defendant offers no authority requiring the People to provide discovery in some specified format or with Bates stamps. Further, we note that defendant's argument directed toward the "most egregious" discovery violation, which pertained [*11]to a presentation created by DOS, is contradicted in the record, as the People advised that the evidence was previously provided to trial counsel and defendant's prior counsel. To the extent that defendant takes exception to the volume of those disclosures, that fact does not render the production deficient pursuant to the requirements of CPL 245.20 (see generally People v Robbins, 206 AD3d 1069, 1071-1072 [3d Dept 2022], lv denied 39 NY3d 942 [2022]). In the remaining instances identified by defendant, we note that even in cases where "evidence is not disclosed until after trial begins, such an error will not require reversal as long as the defense was afforded a meaningful opportunity to use it to cross-examine the People's witnesses or as evidence-in-chief" (People v Williams, 50 AD3d 1177, 1179 [3d Dept 2008]; see People v Stokes, 211 AD3d 1243, 1245 [3d Dept 2022], lv denied 39 NY3d 1143 [2023]). Although defendant contends that the People failed to provide an internal DOS memorandum during discovery, the record indicates that it was turned over prior to trial and, in any event, defendant was able to utilize the presentation to cross-examine Cindi Denick, the accountant at DOS who had created the presentation, as well as Casaregola. Moreover, various internal OSC memoranda that defendant takes similar umbrage with were disclosed and later utilized by defendant to cross-examine Casaregola (see People v Sweet, 200 AD3d 1315, 1319-1320 [3d Dept 2021], lv denied 38 NY3d 930 [2022]; People v Young, 74 AD3d 1471, 1473 [3d Dept 2010], lv denied 15 NY3d 811 [2010]).[FN6] Defendant was also afforded the opportunity to voir dire Casaregola pertaining to an internal OSC logbook in support of his contention that OSC had improperly relied on suppressed material in its analysis. Similarly, County Court permitted defendant to recall both Lynch and Siy after defendant identified certain incomplete email chains by reviewing the discovery provided by the People (see People v Sanchez, 144 AD3d 1179, 1180 [2d Dept 2016]; People v Dawson, 110 AD3d 1350, 1352 [3d Dept 2013], lv denied 23 NY3d 1035 [2014]; People v Jacob, 287 AD2d 740, 741 [2d Dept 2001], lv denied 97 NY2d 729 [2002]). Finally, although an email chain between Jedrysik and an investigator with the Warren County Sheriff's Department (hereinafter WCSD) concerning her prepared statement to investigators was provided to defendant only after Jedrysik had testified, the People stipulated to the introduction of the emails and, more importantly, defendant extensively cross-examined Jedrysik concerning her conversations with the investigator and any potential influence on her statements, thus negating any prejudice to defendant from the belated disclosure and the court's determination not to recall her to the stand (see People v Olson, 126 AD3d 1139, 1141 [3d Dept 2015], lv denied 25 NY3d 1169 [2015]; People v Auleta, 82 AD3d 1417, 1421 [3d Dept 2011], lv denied 17 NY3d 813 [2011]; see also People v Robbins, 206 [*12]AD3d at 1072-1073; People v Socciarelli, 203 AD3d 1642 [4th Dept 2022], lv denied 38 NY3d 1035 [2022]; People v Houze, 177 AD3d 1184, 1188 [3d Dept 2019], lv denied 34 NY3d 1159 [2020]; People v Sorbello, 285 AD2d 88, 96 [2d Dept 2001], lv denied 97 NY2d 658 [2001]).
We turn next to defendant's argument that the People improperly introduced, and relied upon, evidence seized from his residence, offices and storage facility, despite having later conceded to the suppression of such evidence prior to a Mapp hearing. We disagree. "[T]he exclusionary rule enjoins the government from benefiting from evidence it has unlawfully obtained; it does not reach backward to taint information that was in official hands prior to any illegality" (People v Jordan, 154 AD3d 1176, 1177 [3d Dept 2017] [internal quotation marks and citation omitted]; see People v Elder, 173 AD3d 1344, 1345 [3d Dept 2019], lv denied 34 NY3d 930 [2019]; People v Callicut, 101 AD3d 1256, 1257 [3d Dept 2012], lv denied 20 NY3d 1096 [2013]). In other words, "where the evidence sought to be suppressed is the product of an independent source entirely free and distinct from proscribed police activity, it should be admissible and not subject to a per se rule of exclusion based solely on the unlawful conduct" (People v Arnau, 58 NY2d 27, 35 [1982], cert denied 468 US 1217 [1984]; see People v Elder, 173 AD3d at 1345; People v Jordan, 154 AD3d at 1177).
The People initially were in possession of defendant's bank records well before the warrant was executed and there is no dispute that those records, along with defendant's tax records that were already in the possession of DTF, could be obtained through means of a lawful subpoena. In this respect, defendant's contention that the various witnesses for the People relied on suppressed evidence, beyond being contrary to their testimony at trial, is without merit, as the fact that OSC and DTF received the records obtained from the warrant does not obviate that they also possessed the same exact records by lawful means, i.e., the properly issued and unchallenged subpoenas. To this end, defendant points to no indication that the bank and tax records that were relied upon by OSC and DTF were altered or were inaccurate. Accordingly, under the well-established principles of the exclusionary rule, defendant's records obtained through the subpoena and relied upon by the People's witnesses were untainted and properly admitted (see People v Arnau, 58 NY2d at 33-34; People v Jordan, 154 AD3d at 1177; People v Marshall, 57 AD3d 1163, 1165 [3d Dept 2008], lv denied 13 NY3d 940 [2010]).
Defendant's contentions concerning the various evidentiary rulings of County Court are all without merit. First, we are unpersuaded by defendant's contentions pertaining to the striking of part of Ferraro's expert testimony.[FN7] Contrary to defendant's contention, the People properly preserved their objection to Ferraro's testimony by virtue of their numerous requests that defendant [*13]disclose the calculations underlying Ferraro's testimony, which were lodged both before and during Ferraro's testimony. "A defendant's right to present evidence in the form of testimony at trial is not absolute," and when a court is asked to preclude such evidence, it must "weigh the possibility of prejudice to the prosecution against the right of the defendant to present his or her case" (People v LeFebvre, 45 AD3d 1175, 1176 [3d Dept 2007]; see People v Berk, 88 NY2d 257, 266 [1996], cert denied 519 US 859 [1996]). In response to the People raising concerns about the source of the figures contained in Ferraro's presentation, defendant affirmatively represented that Ferraro's entire testimony rested on invoices, vouchers and bank records contained in the record. However, despite those assurances, Ferraro conceded on cross-examination that his calculations relied upon invoices to the Town of Queensbury, payments to Chazen and lists of cash payments to referees on behalf of Empire Allstars that were never admitted or verified by "a witness subject to full cross-examination on the trial" (People v Miller, 57 AD2d 668, 669 [3d Dept 1977] [internal quotation marks and citation omitted]; see People v Jones, 73 NY2d 427, 430 [1989]; People v Ramis, 213 AD3d 951, 952 [2d Dept 2023]). Furthermore, it is evident that defendant failed to properly comply with his reciprocal discovery obligations, as he repeatedly assured the court and the People that Ferraro's testimony was based on nothing other than simple math and so there was nothing to disclose beyond his presentation. However, cross-examination revealed that Ferraro utilized a spreadsheet containing a profit and loss formula to reach his conclusion as to whether defendant suffered a loss from the West Brook contract (see CPL 245.20 [1] [f]; [4] [a]; People v LeFebvre, 45 AD3d at 1176). Considering that Ferraro's reliance on undisclosed and unadmitted evidence was not revealed until the People's cross-examination — despite the prior concerns raised by the People as to the basis for Ferraro's calculations — we discern no abuse of discretion in County Court's decision to strike certain portions of Ferraro's testimony rather than applying a lesser sanction (see People v LeFebvre, 45 AD3d at 1176; cf. People v Williams, 176 AD3d 1122, 1123 [2d Dept 2019], lv denied 34 NY3d 1134 [2020]; People v O'Brien, 140 AD3d 1325, 1328 [3d Dept 2016]; see also CPL 245.80 [2]).
Further, we discern no error in County Court's determination to preclude defendant from presenting recordings of his interviews with investigators. "The general rule is that a party's self-serving statement is inadmissible at trial when offered in his or her favor, and it may not be introduced either through the testimony of the party or through the testimony of a third person" (People v Roberts, 94 AD3d 1151, 1151 [2d Dept 2012] [internal quotation marks and citations omitted], lv denied 19 NY3d 976 [2012]; see People v Ramsaran, 154 AD3d 1051, [*14]1052 [3d Dept 2017], lv denied 30 NY3d 1063 [2017]; People v Soriano, 121 AD3d 1419, 1421-1422 [3d Dept 2014]). The recordings clearly fell under the definition of self-serving hearsay, and defendant was not permitted to introduce such evidence in lieu of his own testimony, where he would be subject to cross-examination (see People v Ramsaran, 154 AD3d at 1052; People v Soriano, 121 AD3d at 1421-1422; People v Valderrama, 285 AD2d 902, 904 [3d Dept 2001], lv denied 97 NY2d 659 [2001]; People v Hughes, 228 AD2d 618, 619 [2d Dept 1996], lv denied 88 NY2d 987 [1996]; People v Williams, 203 AD2d 498, 498-499 [2d Dept 1994], lv denied 84 NY2d 873 [1994]). Defendant's contention that the tapes and transcripts of these interviews were admissible to demonstrate his state of mind lacks merit, as the substance of his interviews pertained to explanations for his past conduct (see People v Kachadourian, 184 AD3d 1021, 1023 [3d Dept 2020], lv denied 35 NY3d 1113 [2020]; People v Ramsaran, 154 AD3d at 1052; see also People v Boateng, 165 AD3d 424, 424 [1st Dept 2018], lv denied 32 NY3d 1169 [2019]).
We also find no merit to defendant's objection concerning the limitations placed on his ability to explore whether political bias motivated the origin of the WCSD criminal investigation. Importantly, the People did not rely on any testimony from members of WCSD, as the bulk of the investigation centered upon an analysis of bank accounts and transactions that was conducted by DOS, OSC and DTF. Accordingly, County Court acted within its discretion in precluding defendant from exploring a collateral issue concerning any potential bias of the WCSD, as the probative value of such evidence was outweighed by the danger that it could confuse or mislead the jury into deciding the case on issues beyond the evidence presented (see People v Davis, 43 NY2d 17, 27 [1977], cert denied 435 US 998 [1978]; People v Plaisted, 2 AD3d 906, 909 [3d Dept 2003], lv denied 2 NY3d 744 [2004]).
Defendant's remaining trial-related contentions merit little discussion. We discern no error in the appointment of a special prosecutor from DTF, as the appointment was clearly authorized and, more importantly, the jury was unaware of her role with DTF as there was no mention during trial of any tangential relation she may have had to the initial investigation (see County Law § 702 [7]; cf. People v Mazzeo, 191 AD3d 1171, 1172-1173 [3d Dept 2021], lv denied 36 NY3d 1121 [2021]; People v Anderson, 237 AD2d 989, 989 [4th Dept 1997]). Further, we discern no deficiencies in either the sufficiency of the People's opening statement (see People v Hazen, 20 AD3d 586, 588 [3d Dept 2005], lv denied 5 NY3d 806 [2005]) or the People's isolated remark during summation concerning the origin of a document. The inference of malfeasance called for by the statement, while arguably expansive, had a strained connection to the primary issues at trial and raised no possibility of substantial prejudice warranting reversal [*15](see People v Leigh, 208 AD3d 1463, 1464-1465 [3d Dept 2022]; People v Gertz, 204 AD3d 1166, 1171 [3d Dept 2022], lv denied 38 NY3d 1070 [2022]).
We are further unpersuaded by defendant's contention that various alleged errors pertaining to County Court's jury instructions warrant reversal. Beginning with his request for a missing witness instruction, the proponent of such must demonstrate that the witness had knowledge that was material to the case, that the expected testimony would be noncumulative and favorable to the party against whom the charge is sought, and that the witness is available to that party (see People v Savinon, 100 NY2d 192, 197 [2003]; People v Lorenz, 211 AD3d 1109, 1112 [3d Dept 2022], lv denied 39 NY3d 1112 [2023]; People v Banks, 181 AD3d 973, 975 [3d Dept 2020], lv denied 35 NY3d 1025 [2020]). Our review satisfies us that County Court did not abuse its discretion in denying a missing witness charge, as defendant's proffer failed to establish that the witnesses he relied on — which consisted of various DOS officials — would have been noncumulative to the testimony of Denick, who testified extensively concerning the DOS audit and was subject to cross-examination (see People v Franqueira, 143 AD3d 1164, 1169 [3d Dept 2016]; People v Stokes, 141 AD3d 1032, 1034 [3d Dept 2016], lv denied 28 NY3d 1075 [2016]). We are similarly unpersuaded that the denial of a circumstantial evidence charge was an abuse of discretion, as the evidence at trial supporting each count consisted of direct evidence — specifically, bank records, invoices and testimony pertaining to unpaid services — alongside the circumstantial evidence of defendant's guilt (see People v Hardy, 26 NY3d 245, 250 [2015]; People v Stover, 178 AD3d 1138, 1145 [3d Dept 2019], lv denied 34 NY3d 1163 [2020]; People v Ash, 162 AD3d 1318, 1322 [3d Dept 2018], lv denied 32 NY3d 1002 [2018]). Defendant's contention that a claim of right instruction was warranted also lacks merit, as there was no reasonable view of the evidence presented at trial pertaining to the larceny — which consisted of proof that he submitted invoices that had already been paid and invoices that were not provided by Linda J. for actual work performed — and the scheme to defraud — which consisted of specific reimbursements that had been made by DOS for services that had been billed by various subcontractors — that suggested the appropriateness of a charge that would require the People to disprove the defense beyond a reasonable doubt (see People v Salamone, 89 AD3d 961, 962 [2d Dept 2011], lv denied 18 NY3d 928 [2012]; see also People v Pagan, 19 NY3d 91, 98 [2012]). Moreover, although not entitled to that instruction, defendant was not deprived of his opportunity to present a defense to the larceny and scheme to defraud counts predicated on his assertion that he was entitled to the funds paid to him (see generally People v Green, 5 NY3d 538, 544 [2005]; compare People v Harrison, 35 AD3d 52, 54 [1st Dept [*16]2006]).
As to defendant's contention that he was entitled to a geographical jurisdiction charge pertaining to the false instrument counts, we initially find that his argument is properly preserved by virtue of his request for a charge pursuant to CPL 20.40 (1) (see People v Greenberg, 89 NY2d 553, 556 [1997]). Nevertheless, we find defendant's contention without merit. "When CPL 20.40 is read as a whole, it is not only apparent, but obvious, that each subdivision which confers geographical jurisdiction is joined by the disjunctive word 'or', which clearly indicates that the venue provisions are to be construed in the alternative" (Matter of Sharpton v Turner, 169 AD2d 947, 949 [3d Dept 1991] [citations omitted]). To this end, the statutory exception to venue contained in CPL 20.40 (4) (m) clearly provides that "[a]n offense under . . . the [P]enal [L]aw of filing a false or fraudulent return, report, document, declaration, statement, or filing . . . may be prosecuted in any county in which an underlying transaction reflected, reported or required to be reflected or reported, in whole or part, on such return, report, document, declaration, statement, or filing occurred" (emphasis added). Defendant does not dispute, nor could he, that the preponderance of the evidence suggests that several transactions that were required to be reported in his returns occurred in Warren County. Accordingly, we find that County Court properly charged the jury pursuant to the exception applicable to the facts underlying the four counts of filing a false instrument (see CPL 20.40 [4] [m]; People v Greenberg, 89 NY2d at 559; People v Nabi, 165 AD3d 1292, 1294 [2d Dept 2018], lv denied 33 NY3d 1034 [2019]).
Defendant also contends, among other purported arguments directed toward jury deliberations, that County Court erred in providing a premature Allen charge during jury deliberations.[FN8] We also discern no abuse of discretion with County Court's response to the jury's request for Casaregola's presentation, and subsequent reminder to clarify that request. The court's reminder was consistent with its initial response and a failure to follow up with the jury on the unanswered inquiry would have been improper (see CPL 310.30; People v Taylor, 26 NY3d 217, 224 [2015]). Our review satisfies us that his argument is without merit. As to his exception to County Court's purported Allen charge, "[a] court may give a deadlock charge that encourages a verdict after the jurors have expressed that they are at an impasse, so long as the charge does not coerce them to reach a particular verdict" (People v Vazquez, 145 AD3d 1268, 1270 [3d Dept 2016] [internal quotation marks and citation omitted]; see People v Moore, 213 AD3d 1213, 1214 [4th Dept 2023], lv denied 39 NY3d 1142 [2023]). In response to the jury's request for a definition of a hung jury, County Court noted that no definition could be given. Moreover, the court went through a lengthy colloquy advising the jury that all 12 members [*17]had to agree on a verdict, regardless of whether that determination was guilty or not guilty. Further, the court advised that sometimes jurors cannot reach a unanimous decision, which, if it were to occur in this case, would cause the case to be tried all over again, requiring the selection of a new jury and the return of the witnesses to testify. The court's statement was not unduly coercive, as there was no language urging the jury to "abandon [their] own conviction" nor any "attempt to shame the jurors into reaching a verdict, or endeavor to compel the jurors to agree upon a particular result" (People v Degree, 186 AD3d 501, 503 [2d Dept 2020] [internal quotation marks and citation omitted], lv denied 36 NY3d 971 [2020]; see People v Muirhead, 110 AD3d 833, 834 [2d Dept 2013], lv denied 22 NY3d 997 [2013]); rather, the language employed by the court, as a whole, was encouraging and the court made it clear that the ultimate decision as to defendant's guilt was in the province of the jury (see People v Pagan, 45 NY2d 725, 727 [1978]; People v Moore, 213 AD3d 1213, 1214 [4th Dept 2023], lv denied 39 NY3d 1142 [2023]; People v Kinard, 215 AD2d 591, 591 [2d Dept 1995], lv denied 86 NY2d 797 [1995]). Moreover, the lack of coercion is reflected in the fact that the jury deliberated for two further days after the court's instruction (see People v Degree, 186 AD3d at 503; People v Glover, 165 AD2d 761, 763 [1st Dept 1990], lv denied 77 NY2d 877 [1991]; compare People v Aponte, 2 NY3d 304, 309 [2004]).[FN9] Defendant's contention that the onset of the COVID-19 pandemic, considered alongside County Court's statement, may have influenced the jury is unavailing. The record reflects that the court was aware of this dynamic toward the end of trial and the manner in which it allowed the jury to proceed was entirely appropriate.
Turning to defendant's sentence, we initially reject his contention that the sentence constituted a trial penalty, as "the mere fact that a sentence imposed after trial is greater than that offered in connection with plea negotiations is not proof positive that . . . defendant was punished for asserting his . . . right to trial" (People v Flower, 173 AD3d 1449, 1458 [3d Dept 2019] [internal quotation marks and citations omitted], lv denied 34 NY3d 931 [2019]). As to his request to reduce his sentence in the interest of justice, we reject defendant's characterization of his offenses as "victimless," as it fails to account for the harm to public confidence that flows from the theft of public funds. To that end, while we have carefully considered the various factors raised in support of his request — such as defendant's health and military service — his criminal conduct perpetrated over a number of years and his lack of remorse satisfies us that the sentence is not unduly harsh or severe and we therefore decline his invitation to modify it (see People v Caraballo, 213 AD3d 1142, 1145 [3d Dept 2023]; see also People v Casalino, 204 AD3d 1078, [*18]1083 [3d Dept 2022], lv denied 38 NY3d 1070 [2022]; People v Marshall, 106 AD3d 1, 11 [1st Dept 2013], lv denied 21 NY3d 1006 [2013]; People v Madison, 104 AD3d 1025, 1025 [3d Dept 2013]; People v Provost, 25 AD3d 1016, 1017 [3d Dept 2006], lv denied 6 NY3d 817 [2006]).
We further reject defendant's contentions concerning County Court's restitution order, as our review of the hearing satisfies us that the People met their burden to demonstrate the amount taken minus any benefit conferred (see People v Tzitzikalakis, 8 NY3d 217, 221-222 [2007]; People v Decker, 139 AD3d 1113, 1118 [3d Dept 2016], lv denied 28 NY3d 928 [2016]). Further, we discern no abuse of discretion in County Court's decision to deny defendant's subpoenas, which we agree were overbroad and sought cumulative information to the voluminous submissions already provided. To this end, we find that defendant was properly provided " 'with a reasonable opportunity to contest the People's evidence or supply evidence on his own behalf' " (People v Connolly, 27 NY3d 355, 359 [2016], quoting People v Consalvo, 89 NY2d 140, 146 [1996]). Defendant's remaining contentions, to the extent that they are not addressed explicitly herein, have been considered and found unavailing.
Egan Jr., J.P., Aarons, Ceresia and Fisher, JJ., concur.
ORDERED that the judgment and the order are affirmed, and matter remitted to the County Court of Warren County for further proceedings pursuant to CPL 460.50 (5).

Footnotes

Footnote 1:

Footnote 2:

Footnote 3:

Footnote 4:

Footnote 5:

Footnote 6:

Footnote 7:

Footnote 8:

Footnote 9: