People v Jones (2023 NY Slip Op 02032)

People v Jones

2023 NY Slip Op 02032

Decided on April 20, 2023

Appellate Division, Third Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered:April 20, 2023

110589
[*1]The People of the State of New York, Respondent,
v
Brandon Jones, Also Known as B and Bu, Appellant.

Calendar Date:February 16, 2023

Before:Egan Jr., J.P., Clark, Pritzker, Ceresia and Fisher, JJ. 

Marlene O. Tuczinski, Chatham, for appellant.
P. David Soares, District Attorney, Albany (Vincent Stark of counsel), for respondent.

Ceresia, J.
Appeal from a judgment of the Supreme Court (Richard J. McNally Jr., J.), rendered July 3, 2018 in Albany County, upon a verdict convicting defendant of the crimes of burglary in the second degree (two counts) and robbery in the second degree (six counts).
In the early morning hours of July 11, 2016, two masked men entered a residence on Clermont Street in the City of Albany, wherein five people were sleeping, and robbed them of cash, cell phones and other belongings. Thereafter, defendant and four other individuals — Hud Ahmed Yahia, Armandi Villanueva, Dan Stevens and Darnell Brabham — were arrested. As pertinent here, defendant and Brabham were charged by way of indictment with two counts of burglary in the second degree (see Penal Law § 140.25 [1] [d]; [2]) and six counts of robbery in the second degree (see Penal Law § 160.10 [1], [2] [b]), and proceeded together to a jury trial. Ultimately, Brabham was acquitted of all charges, but defendant was found guilty as charged, and thereafter sentenced, as a second violent felony offender, to eight concurrent prison terms of 10 years, to be followed by five years of postrelease supervision. Defendant appeals.
It is defendant's first contention that the trial evidence is legally insufficient, and that the verdict is against the weight of the evidence, because proof of his identity rested solely on uncorroborated and inconsistentaccomplice testimony from Villanueva and Yahia. "When considering a challenge to the legal sufficiency of the evidence, we view the evidence in the light most favorable to the People and evaluate whether there is any valid line of reasoning and permissible inferences which could lead a rational person to the conclusion reached by the jury on the basis of the evidence at trial and as a matter of law satisfy the proof and burden requirements for every element of the crime charged" (People v Galusha, 211 AD3d 1421, 1422 [3d Dept 2022] [internal quotation marks and citations omitted]; see People v Smith, 206 AD3d 1058, 1062 [3d Dept 2022]). "In contrast, when assessing whether a verdict is supported by the weight of the evidence, we must first determine whether, based on all the credible evidence, a different finding would not have been unreasonable, and, if it would have been reasonable for the jury to reach a different conclusion, then we must weigh the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony to determine whether the jury has failed to give the evidence the weight it should be accorded" (People v Harris, 206 AD3d 1454, 1455-1456 [3d Dept 2022] [internal quotation marks, brackets and citations omitted], lv denied 39 NY3d 940 [2022]; see People v Shabazz, 211 AD3d 1093, 1094 [3d Dept 2022], lv denied ___ NY3d ___ [Mar. 23, 2023]).
As is relevant here, "[a] person is guilty of burglary in the second degree when he [or she] knowingly enters or remains unlawfully in a building with [*2]intent to commit a crime therein, and when[,] . . . [i]n effecting entry or while in the building or in immediate flight therefrom, he [or she] or another participant in the crime . . . [d]isplays what appears to be a pistol, revolver, rifle, shotgun, machine gun or other firearm" (Penal Law § 140.25 [1] [d]). Additionally, "[a] person is guilty of burglary in the second degree when he [or she] knowingly enters or remains unlawfully in a building with intent to commit a crime therein, and when . . . [t]he building is a dwelling" (Penal Law § 140.25 [2]). Separately, "[a] person is guilty of robbery in the second degree when he [or she] forcibly steals property and when . . . [h]e [or she] is aided by another person actually present[,] or . . . [i]n the course of the commission of the crime or of immediate flight therefrom, he [or she] or another participant in the crime . . . [d]isplays what appears to be a pistol, revolver, rifle, shotgun, machine gun or other firearm" (Penal Law § 160.10 [1], [2] [b]).
"[A]s with all convictions, the People must prove the issue of identity beyond a reasonable doubt — that is, that the defendant was the person who committed the charged crimes" (People v Davis, 200 AD3d 1200, 1201 [3d Dept 2021] [internal quotation marks and citation omitted]; see People v Shabazz, 211 AD3d at 1095). "A defendant may not be convicted of any offense upon the testimony of an accomplice unsupported by corroborative evidence tending to connect the defendant with the commission of such offense" (CPL 60.22 [1]; see People v Ashe, 208 AD3d 1500, 1502 [3d Dept 2022], lv denied 39 NY3d 961 [2022]; People v Davis, 200 AD3d at 1201).
Villanueva testified during the trial as follows. He lived at a residence on Washington Avenue in the City of Albany with Yahia and another roommate. On the evening of July 10, 2016, he and Yahia were visited at their residence by defendant, Brabham and Stevens, and the group proceeded to play video games and smoke marihuana. Villanueva identified all five members of the group from their mug shots, which were in evidence. At one point, he heard the three visitors talking about stealing marihuana from someone named "BJ." Around 2:00 or 3:00 a.m., he left the residence with defendant, Brabham and Stevens, believing that they were going to get food from a 24-hour store. Brabham, who was driving, pulled over on a side street, and defendant and Stevens exited the vehicle, wearing black clothing and bandanas. The two were gone for 10 to 20 minutes, and then returned wanting to drive away quickly. Brabham complied, and Stevens began throwing cell phones out the window. After arriving back at the Washington Avenue residence, defendant, Brabham and Stevens talked excitedly about the items they had taken. Yahia, who had been asleep, was awakened by the commotion. Yahia and Brabham eventually left the residence to go to the store, and Stevens left at some point as well. Subsequently, police arrived and arrested Villanueva [*3]and defendant.
Yahia also testified at trial. Pursuant to his testimony, he and Villanueva had been having money troubles and were considering robbing someone. Yahia was the one who provided BJ's name and address on Clermont Street to the others, because he knew BJ was a drug dealer who had money and, in fact, BJ had recently recruited Yahia to participate in a drug dealing operation. Yahia gave them a BB gun, but then went to bed. He was later awakened by Villanueva slamming his bedroom door open, screaming profane language and pulling out wads of money. When Yahia went into the living room, everyone was excited and pulling out stolen items. He recalled Stevens laughing about one of the victims being unclothed and tying him up with a cord. Everyone received a cut of the money, and Yahia put his share in his bedroom and then left with Brabham in defendant's vehicle. Shortly thereafter, they were pulled over by the police and arrested. In addition to describing the events that took place on the night in question, Yahia also gave testimony regarding the stature of defendant and Stevens, indicating that defendant is approximately six feet, two or three inches tall, and Stevens is approximately six feet, four or five inches tall.
The first victim to testify was a resident of the Clermont Street residence, which he shared with BJ, among others. According to him, he was disturbed from his sleep at approximately 3:30 a.m. when he heard someone in the hallway. After hearing his bedroom door open, he felt someone jump on top of him. He saw just one individual and only in silhouette, but was later told there were two intruders. He was placed lying face down on the floor with a knee or elbow pressed into his back and something pressed against the back of his head, and his hands were bound behind his back with a television cord and tape. He was warned that if he moved or if the items being searched for were not found, he and his roommates would be killed. Ultimately, his cell phone and wallet were taken.
The second victim to testify was BJ's girlfriend. She was asleep with BJ in his bed when she was awakened at approximately 3:30 a.m. to the sounds of loud banging and rummaging, and she opened her eyes to see two intruders — both Black males, one taller and one shorter — holding guns and taking items out of BJ's dresser. The taller man was about six feet, four inches tall, wearing dark pants, a sweatshirt, a dark ski mask over his head and latex gloves. The shorter man was wearing dark clothes and a paisley bandana over his nose and mouth. His hair was visible and was styled in braids or tight curls a few inches in length. The second victim knew Yahia and neither of the men were him. She yelped in surprise, and the taller man said, "oh, the b***h is awake." The two men then jumped on her and BJ, the taller man put a gun to her head, and they began demanding money and drugs — specifically, "pounds" of marihuana. The demands continued while the two men brought [*4]her and BJ into the adjacent bedroom and made them sit next to the first victim, who was lying on the floor. One of the men threatened to shoot her if they did not find what they were looking for. Eventually the men left, taking her cell phone with them.
BJ was the third victim to testify. His version of events was largely the same as his girlfriend's. According to him, the two intruders were Black males of different heights. He indicated that he is six feet tall, and the taller man was taller than him and was wearing a ski mask. The shorter man was shorter than him and was wearing a bandana over the lower part of his face. He thought that he saw braids on the shorter man. Both of the men were wearing gloves. The intruders took his phone, wallet, camera and about seven to eight thousand dollars in cash. Like his girlfriend, he knew Yahia and did not believe that Yahia was one of the two men.
The fourth and fifth victims to testify were sleeping in another bedroom during the robbery, and awoke when their dog started barking. The fourth victim, who stated that he is six feet, two inches tall, then saw two men enter his bedroom with handguns pointed toward him. Although he admitted that he was "not the best at identifying height," he testified that the taller man was about two inches taller than him, and the shorter man was about five inches shorter than him. The taller man was wearing a ski mask, while the shorter man was wearing a bandana and had medium-length hair styled in tight braids reaching to the bottom of his neck. The fifth victim described the taller man as approximately six feet tall and wearing a ski mask, and the shorter man as wearing a hoodie and a bandana with "some dreads sticking out," reaching to the bottom of his neck. He knew Yahia and did not recognize either intruder as being him.
Law enforcement personnel involved in the investigation also testified. At around 3:45 a.m. on the date in issue, the police responded to the Clermont Street residence regarding a robbery/burglary call. After speaking with the victims, an officer suggested that they attempt to track two of the stolen cell phones using the "Find My iPhone" application. Both stolen phones were tracked to locations along Washington Avenue, prompting officers to go to one of those locations to investigate. While patrolling that area on foot, the officers approached what turned out to be Villanueva's and Yahia's residence, where they could overhear loud, excited conversation among a group of men inside, with one of the voices saying, "[w]e scared the f***k out of that b***h," and a voice also saying, "we should have taken her laptop." Shortly thereafter, two men exited the residence and started to drive away in a vehicle. The patrol officers proceeded to conduct a traffic stop of the vehicle. Meanwhile, they received information from other officers noting that one cell phone had begun "pinging" in different locations, seeming to move along Washington Avenue, and then [*5]appearing to halt at the same location where the traffic stop was conducted. Brabham and Yahia, the occupants of the vehicle, were arrested, and $1,655 in cash was retrieved from Brabham's person. It was discovered that the vehicle was registered to defendant. A subsequent search of the vehicle revealed the cell phone, driver's license and credit cards of one of the victims.
Additional police officers tasked with conducting searches of the Washington Avenue residence and defendant's vehicle also testified. In the residence, the police discovered iPhones, wallets, identification cards, large sums of cash, bandanas, rubber gloves, a digital camera and sweatshirts, among other things. One identification card belonged to Stevens and indicated that he was six feet, five inches tall. Currency was found behind a radiator and inside a bedroom. One bundle of cash totaled $1,584, and another amounted to $1,125. The police also found a box of BBs and CO2 cartridges. Inside the vehicle, the police found iPhones, a bandana and a wallet containing cards with the name of one of the victims on them, among other items.
Defendant testified on his own behalf. According to him, he was at the Washington Avenue residence on the night in question but did not overhear or participate in any discussion about a robbery. At one point, Stevens asked to use defendant's vehicle, but defendant declined. Feeling intoxicated from drinking and smoking marihuana, defendant fell asleep on the couch. He later awoke to sounds of commotion and noticed that his keys were not where he had left them. Upon seeing that the police were outside, he walked out with his hands up and complied with the officers. Defendant stated that at that time his hair was styled in shorter dreadlocks with blond tips.
Inasmuch as Villanueva and Yahia, the only two witnesses to identify defendant as a participant in the robbery, were accomplices as a matter of law, corroboration of their testimony was mandated (see People v Ashe, 208 AD3d at 1502; People v Davis, 200 AD3d at 1201). "The corroborative evidence required . . . need not be powerful in itself. [It] need not show the commission of the crime; it need not show that [the] defendant was connected with the commission of the crime. It is enough if it tends to connect the defendant with the commission of the crime in such a way as may reasonably satisfy the jury that the accomplice is telling the truth" (People v Reome, 15 NY3d 188, 191-192 [2010] [internal quotation marks and citations omitted]). "Seemingly insignificant matters may harmonize with the accomplice's narrative so as to provide the necessary corroboration" (People v Breland, 83 NY2d 286, 292-293 [1994] [internal quotation marks and citations omitted]; see People v Reome, 15 NY3d at 194; People v Rodriguez, 52 AD3d 1047, 1048 [3d Dept 2008]). Notably, "the People [are] not required to corroborate [a] defendant's identity" (People v Garcia, 170 AD3d 462, 463 [1st Dept 2019], lvs denied 33 NY3d [*6]1069 [2019], 35 NY3d 1026 [2020]), just as "[t]he corroborative evidence need not establish all the elements of the offense" (People v Breland, 83 NY2d at 292 [internal quotation marks, ellipsis and citation omitted]; accord People v Rodriguez, 52 AD3d at 1048; see People v Myrick, 135 AD3d 1069, 1070 [3d Dept 2016]).
We find that, when viewed in the light most favorable to the People, the evidence — including the corroborative evidence presented — is legally sufficient to support defendant's convictions (see People v Ashe, 208 AD3d at 1505; People v Smith, 63 AD3d 1301, 1302-1303 [3d Dept 2009], lv denied 13 NY3d 862 [2009]; People v Adams, 222 AD2d 1093, 1093-1094 [4th Dept 1995], lv denied 88 NY2d 844 [1996]). In that regard, we note that the facts in People v Reome (15 NY3d at 194), one of the seminal cases on accomplice corroboration, are instructive. There, a victim was raped by four men, and although the victim could not identify her attackers, an accomplice testified that the perpetrators were the defendant, himself and two others. The victim described one of her rapists as having dirty blond hair, and of the individuals identified by the accomplice, the defendant was the only one to match that description. This, together with other corroborative evidence to the effect that the defendant was friends with the accomplice and there had been phone calls made between the defendant and the accomplice around the time of the crime, furnished the requisite proof tending to connect the defendant to the commission of the crime (see id.).
Here, there was ample corroborative evidence that harmonized with the accomplice testimony and tended to link defendant to the commission of the crimes in such a way that the jury could be reasonably satisfied that the testimony given by the accomplices was truthful. To begin with, as summarized above, Villanueva's testimony revealed that it was defendant and Stevens who actually entered the Clermont Street residence and committed the crimes, and Yahia's testimony demonstrated that defendant was shorter than Stevens. This evidence of varying heights was corroborated by the testimony of the four victims who were able to observe both intruders, all of whom testified that one was taller than the other. Any discrepancies in the descriptions of the intruders' precise heights by the victims — whose perceptions were undoubtedly impacted by the stress of a sudden, armed home invasion in the middle of the night — presented factual questions for the jury to weigh (see People v Hanzlik, 95 AD3d 601, 602 [1st Dept 2012], lv denied 19 NY3d 997 [2012]).
As for hairstyle, Villanueva identified defendant from his mug shot, which depicted him as the only suspect having short dreadlocks reaching to the bottom of his neck. Such evidence was corroborated by the above-referenced four victims, who testified that the shorter intruder's hair was styled in short braids, tight curls or dreadlocks. Of these four victims, one testified that [*7]this hairstyle was a few inches long and two testified that it reached to around the bottom of the neck. To the extent that defendant argues that the victims' failure to mention the blond tips in his hair necessarily excludes him as a perpetrator, we disagree. Not only are the blond tips, as portrayed in defendant's mug shot, less than striking — particularly when considering the circumstances in which the intruders were observed — but the significance, if any, of such an omission from the victims' testimony was for the jury to resolve (see People v Lanier, 130 AD3d 1310, 1311 [3d Dept 2015], lv denied 26 NY3d 1009 [2015]; People v Denis, 276 AD2d 237, 245 [3d Dept 2000], lv denied 96 NY2d 782 [2001]).
In addition, Villanueva testified that defendant and Stevens were wearing black clothes and bandanas, and this was corroborated by the same four victims, who testified that both intruders were wearing dark clothes and that the shorter intruder had on a bandana. Villanueva also testified that Stevens, upon returning to the vehicle, stated that he had to get rid of cell phones and then threw phones out the window as they drove back to the Washington Avenue residence. This was corroborated by the victims' testimony that their cell phones were stolen, along with evidence that two of the phones were tracked to Washington Avenue, one of which was ultimately located inside defendant's vehicle, together with other stolen items. Also in keeping with the accomplice testimony, stolen items were found in the Washington Avenue residence, along with BBs, CO2 cartridges, bandanas, sweatshirts, latex gloves and quantities of cash consistent with the proceeds of the robbery having been split among the members of the group. Further, both Villanueva and Yahia testified that there was loud, excited conversation after the robbery, and patrol officers indicated that they overheard such a discussion from outside of the residence. It is additionally noted that defendant's own testimony placed him at the Washington Avenue residence before and after the crime, together with his vehicle. Although it was his testimony that he was not involved in the robbery, the jury was free to accept certain aspects of his testimony while rejecting others (see People v Gage, 259 AD2d 837, 839-840 [3d Dept 1999], lv denied 93 NY2d 924 [1999]). In that same vein, any purported inconsistencies between Villanueva's and Yahia's versions of the events presented credibility questions for the jury (see People v Hanzlik, 95 AD3d at 602; People v Lind, 20 AD3d 765, 767 [3d Dept 2005], lv denied 5 NY3d 830 [2005]).
Regarding defendant's reliance upon our decision in People v Green (194 AD3d 1106 [3d Dept 2021]), we find such dependence to be misplaced, as that case did not involve accomplice testimony. While the evidence of identity was found to be insufficient in People v Green, the proof required to establish identity is of a far greater degree than the proof required to corroborate independently [*8]probative accomplice testimony, which may be " 'of a distinctly inferior quality' " (People v Reome, 15 NY3d at 192, quoting People v Breland, 83 NY2d at 294).
Turning next to the weight of the evidence, we acknowledge that a different verdict would not have been unreasonable, in light of the lack of a positive identification of defendant from a source other than an accomplice. Nevertheless, viewing the evidence in a neutral light and deferring to the jury's resolution of credibility issues, the verdict is not against the weight of the evidence (see People v Ashe, 208 AD3d at 1505; People v Lawrence, 141 AD3d 828, 832 [3d Dept 2016], lv denied 28 NY3d 1073 [2016]).
As for defendant's argument that the indictment should have been signed by the elected district attorney rather than an assistant district attorney, such a claimed defect is not jurisdictional in nature and thus requires preservation, which is lacking here (see People v Hardie, 211 AD3d 1418, 1419 [3d Dept 2022], lv denied ___ NY3d___ [Mar. 29, 2023]). In any event, the signature of an assistant district attorney on an indictment satisfies the mandates of CPL 200.50 (9) (see People v Broomfield, 128 AD3d 1271, 1272 [3d Dept 2015], lv denied 26 NY3d 1086 [2015]; People v Burch, 97 AD3d 987, 988 [3d Dept 2012], lv denied 19 NY3d 1101 [2012]; see generally People v Morris, 161 AD3d 1219, 1220 [3d Dept 2018], lv denied 33 NY3d 1033 [2019]), and we reject defendant's argument that County Law § 702 requires the elected district attorney's signature on every indictment.
Supreme Court did not err in denying defendant's challenges for cause to certain prospective jurors. Defendant exercised three challenges for cause relative to prospective jurors who expressed an erroneous understanding of the legal concept concerning accessorial liability. However, with respect to the first two of these three, the court promptly interjected and provided clarification as to the correct application of the law. As for the third, the prosecutor explained to the juror, among other things, that the court would provide the jury with legal definitions and the juror later indicated that she would follow the law as given to her on that topic. Separately, two challenges for cause were brought by defendant due to prospective jurors' purported inabilities to declare their impartiality. One of these jurors [FN1] initially mistakenly believed that the case might involve someone she knew. Nonetheless, once it was made clear that this case was unrelated to the case she was referencing, she ultimately stated that she would be fair and impartial. The other juror, who was herself a victim of several crimes — some similar to the crimes charged in the instant case — first indicated that she "hope[d]" that she would not hold a grudge and would be able to keep an open mind, but upon further questioning from the court, she unequivocally assured that she would set her prior experiences aside, not hold a grudge and follow the law as instructed [*9]to her.
With respect to defendant's claim that he was deprived of a fair trial based upon comments made by the prosecutor during her summation and in a PowerPoint presentation, defendant's failure to lodge objections renders these issues unpreserved (see People v Paige, 211 AD3d 1333, 1337 [3d Dept 2022]; People v Morton, 198 AD3d 1176, 1180 [3d Dept 2021], lv denied 37 NY3d 1163 [2022]). Were we to consider this issue, we would find it meritless. Although the prosecutor recalled to the jury that four victims described the shorter intruder as being "dark skinned," when in reality only two of the victims had testified to that effect, such a mischaracterization did not rise to the level of "substantial prejudice, resulting in a denial of due process" (People v Gertz, 204 AD3d 1166, 1171 [3d Dept 2022] [internal quotation marks and citations omitted], lv denied 38 NY3d 1070 [2022]). Moreover, the prosecutor's recitation of the shorter intruder's height as being "about six feet" was not improper, given that one of the victims had testified that this intruder was "probably" 5 feet, 11 inches tall, notwithstanding testimony from other witnesses approximating differing heights. Regarding defendant's related claim that his counsel was deficient for failing to object on these grounds, "failure to make an argument, objection or motion that has little chance of success does not constitute the ineffective assistance of counsel" (People v Leonard, 177 AD3d 1158, 1163 [3d Dept 2019], lv denied 34 NY3d 1160 [2020]; see People v Mosley, 155 AD3d 1124, 1129 [3d Dept 2017], lv denied 31 NY3d 985 [2018]). Moreover, we have reviewed counsel's overall performance — namely, his participation in pretrial hearings and plea bargaining, his cogent legal theory at trial, his zealous cross-examination and his well-prepared summation — and are satisfied that defendant was provided with meaningful representation (see People v Hilton, 166 AD3d 1316, 1320-1321 [3d Dept 2018], lv denied 32 NY3d 1205 [2019]).
Defendant's challenge to Supreme Court's jury instruction regarding corroboration of accomplice testimony is unpreserved, inasmuch as he failed to object to the charge as given (see People v Colter, 206 AD3d 1371, 1372 [3d Dept 2022], lv denied 38 NY3d 1149 [2022]). In any event, although the court did not explicitly instruct the jury that the testimony of one accomplice cannot be used to corroborate another, the court advised that accomplice testimony must be corroborated and that even if the jury found "either or both [of the accomplices] to be believable," they could not convict without additional corroborative proof. Thus, the instruction sufficiently conveyed the relevant legal concepts (see People v Abussalam, 196 AD3d 1000, 1009 [3d Dept 2021], lv denied 37 NY3d 1144 [2021]).
Finally, defendant's sentence was neither harsh nor excessive, considering his prior violent felony conviction as well as the serious nature of the robbery and defendant's role in it (see People [*10]v Khalil, 206 AD3d 1300, 1305 [3d Dept 2022], lv denied 38 NY3d 1188 [2022]). To the extent not expressly addressed herein, defendant's remaining arguments, including his unpreserved assertion that the grand jury proceedings were impaired, have been considered and found to be unavailing.
Egan Jr., J.P., Clark, Pritzker and Fisher, JJ., concur.
ORDERED that the judgment is affirmed.

Footnotes

Footnote 1: This juror was also one of the aforementioned three jurors who were challenged for cause based upon their alleged misunderstanding of accessorial liability.