People v Luna (2024 NY Slip Op 03201)

People v Luna

2024 NY Slip Op 03201

Decided on June 13, 2024

Appellate Division, Third Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered:June 13, 2024

110729
[*1]The People of the State of New York, Respondent,
v
Joevany Luna, Appellant.

Calendar Date:April 23, 2024

Before:Pritzker, J.P., Reynolds Fitzgerald, Ceresia, McShan and Mackey, JJ.

Danielle Neroni Reilly, Albany, for appellant.
Robert M. Carney, District Attorney, Schenectady (Peter H. Willis of counsel), for respondent.

Ceresia, J.
Appeal from a judgment of the County Court of Schenectady County (Matthew J. Sypniewski, J.), rendered July 30, 2018, upon a verdict convicting defendant of the crimes of murder in the first degree, conspiracy in second degree and criminal possession of a weapon in the second degree (two counts).
In the early morning hours of November 19, 2016, Charles Dembrosky (hereinafter the victim) was shot once in the neck outside his apartment in the City of Schenectady, resulting in his near-instant death. Nine months later, defendant, Tarchand Lall and Kyshaan Moore were charged by way of indictment with murder in the first degree, conspiracy in the second degree and two counts of criminal possession of a weapon in the second degree.[FN1] Lall's trial was severed, and defendant and Moore were tried together. Defendant was convicted as charged and was thereafter sentenced to a prison term of life without the possibility of parole on the murder count. As for the remaining counts, defendant was sentenced, as a second felony offender, to a concurrent prison term of 12½ to 25 years on the conspiracy charge, and, as a second violent felony offender, to 15 years in prison plus five years of postrelease supervision on each of the weapon possession charges, ordered to run concurrently with each other and consecutively to the murder and conspiracy charges. Defendant appeals.
Initially, defendant contends that the evidence is legally insufficient to sustain his convictions and that the verdict is against the weight of the evidence. "In conducting a legal sufficiency analysis, this Court views the evidence in the light most favorable to the People and evaluates whether there is any valid line of reasoning and permissible inferences which could lead a rational person to the conclusion reached by the jury on the basis of the evidence at trial and as a matter of law satisfy the proof and burden requirements for every element of the crime charged" (People v Warner, 194 AD3d 1098, 1099 [3d Dept 2021] [internal quotation marks and citations omitted], lv denied 37 NY3d 1030 [2021]; see People v Agan, 207 AD3d 861, 862 [3d Dept 2022], lvs denied 38 NY3d 1186 [2022], 39 NY3d 939 [2022]). Conversely, "[w]hen undertaking a weight of the evidence review, we must first determine whether, based on all the credible evidence, a different finding would not have been unreasonable and, if not, then weigh the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony to determine if the verdict is supported by the weight of the evidence" (People v Agan, 207 AD3d at 862-863 [internal quotation marks and citations omitted]; see People v Rivera, 212 AD3d 942, 944 [3d Dept 2023], lv denied 39 NY3d 1113 [2023]).
As relevant here, "[a] person is guilty of murder in the first degree when . . . the defendant committed the killing or procured commission of the killing pursuant to an agreement with a person other than [*2]the intended victim to commit the same for the receipt, or in expectation of the receipt, of anything of pecuniary value from a party to the agreement or from a person other than the intended victim acting at the direction of a party to such agreement" (Penal Law § 125.27 [1] [a] [vi]). Further, "[a] person is guilty of conspiracy in the second degree when, with intent that conduct constituting a class A felony be performed, he [or she] agrees with one or more persons to engage in or cause the performance of such conduct" (Penal Law § 105.15). Additionally, "[a] person is guilty of criminal possession of a weapon in the second degree when . . . with intent to use the same unlawfully against another, such person . . . possesses a loaded firearm" (Penal Law § 265.03 [1] [b]) or when "such person possesses any loaded firearm" outside "such person's home or place of business" (Penal Law § 265.03 [3]).
Defendant's girlfriend at the time of the charged crimes (hereinafter the girlfriend) testified as follows. In November 2016, she was living in Delaware with her children and dating defendant, who also lived in Delaware. Around that time, defendant told her that he had to go to New York to handle some business, which he subsequently clarified to mean he was going to kill someone. She understood that he would be paid $10,000 to do this. Defendant asked her to go to Walmart and pick up a "[m]oney [g]ram" which was being sent by his associates in New York to cover the cost of a car rental. On November 16, 2016, defendant and the girlfriend went to Walmart, where she retrieved cash in the amount of $700 and gave it to defendant. Days later, defendant went to the girlfriend's house and dropped off his car, asking her to take it out and use it that evening. She saw him walk outside toward a red sedan with at least one other person inside. That night, she talked to defendant multiple times on the phone, with him telling her at one point that he was in upstate New York. She later tried calling him, but the call went straight to voicemail and she was unable to reach him at that number at any point thereafter. The next morning, defendant arrived back at the girlfriend's house. She asked him what happened, and he responded, "[t]he less you know, the better you are." When she continued to press him, defendant told her that he "killed someone." During that same day, she saw him disassemble a handgun and soak the components in bleach. She told defendant that she wanted the gun out of the house and he eventually got rid of it. In addition, at defendant's request, the girlfriend reported that defendant's cell phone had been stolen.
An insurance agent testified that, in May 2016, Lall obtained a life insurance policy in the amount of $150,000, for which the victim was the insured party and Lall was the beneficiary. At that time, Lall claimed that the victim was his domestic partner. Lall contacted the agent three times in the ensuing months to verify that the policy was [*3]still in effect. In the days leading up to the shooting, Lall made two cash withdrawals from his bank account, each totaling $5,000. Two days after the shooting, Lall again contacted the insurance agent and indicated that he wanted to collect the death benefit, resulting in an investigation that revealed that Lall and the victim were not, in actuality, domestic partners.
The police reviewed the victim's phone records and determined that the last three calls received by the victim on the morning of his death were from someone using a number with an area code covering a part of Pennsylvania that is close to Delaware (hereinafter the Pennsylvania number). Shortly after the victim was killed, the phone connected to the Pennsylvania number was turned off and never used again. Although the Pennsylvania number was associated with a prepaid cell phone that did not have a named subscriber, there was evidence that the girlfriend contacted defendant at this number and, indeed, defendant told both the police and his probation officer that the number was his. The Pennsylvania number also had numerous contacts with Lall, including over 100 calls in the month before the shooting, but none afterward. On November 16, 2016, the date that defendant and the girlfriend went to Walmart to pick up cash, Lall received a text message from the Pennsylvania number consisting of the girlfriend's full name.
Cell site location data indicated that the phone using the Pennsylvania number traveled north from Delaware and followed the New York State Thruway to Schenectady in the hours leading up to the shooting, before it was turned off and never used again. The police used the state's license plate reader system to determine that the only vehicle to make this roundtrip during the relevant time period was a red sedan registered to Moore's girlfriend, who testified and confirmed that it was her vehicle that had been captured by the license plate reader. She stated that Moore had access to her car and later told her that he was in New York for a dice game during the relevant weekend.
Through their investigation, the police learned the number for Moore's cell phone and determined that this phone, too, had traveled from Delaware to Schenectady at the same time as the Pennsylvania number on the night in question, and had also traveled back to Delaware later that night. There were numerous calls between Moore's number and the Pennsylvania number on the day of the shooting — but, notably, no calls between the two numbers during the time period that they were both tracked traveling to New York.
Surveillance cameras positioned at various points in Schenectady captured the movements of a red sedan on the night in issue. The car could be seen approaching Lall's residence shortly before the shooting, with what appeared to be two people inside, and an individual, identified at trial as Lall, was observed walking between the car and the residence. The car then drove toward the victim's home[*4], coming within a few blocks before it was no longer visible due to a lack of surveillance cameras in that area. The car passed Lall's residence again approximately one hour later, before departing the area.
The police also obtained eavesdropping warrants for various phone numbers and intercepted a number of calls between defendant and Moore. In one call, a voice identified as defendant's asks a person identified as Moore whether the police have "any [pictures] of us," and Moore responds that the police have video "of us driving." In another call, Moore tells a third party that the "[m]otherf***er shot his a** as soon as he came out." In addition, during a subsequent police interview, defendant stated that even if he named other individuals, he was still going to jail.
The foregoing evidence, viewed in the light most favorable to the People, is legally sufficient to support each of defendant's convictions (see People v Jones, 215 AD3d 1123, 1129 [3d Dept 2023], lv denied 40 NY3d 935 [2023]; People v Warner, 194 AD3d 1098, 1103 [3d Dept 2021], lv denied 37 NY3d 1030 [2021]). As for defendant's argument that the People's proof fell short because it rested on the testimony of a purported accomplice — the girlfriend — whose testimony was not sufficiently corroborated, we disagree. While a defendant may not be convicted of an offense solely upon the testimony of an accomplice, the necessary corroborative evidence " 'need not show that the defendant was connected with the commission of the crime; it . . . is enough if it tends to connect the defendant with the commission of the crime in such a way as may reasonably satisfy the jury that the accomplice is telling the truth' " (People v Reome, 15 NY3d 188, 192 [2010], quoting People v Dixon, 231 NY 111, 116 [1921]; accord People v Ashe, 208 AD3d 1500, 1502 [3d Dept 2022], lv denied 39 NY3d 961 [2022]). That said, even assuming that the jury concluded that the girlfriend was an accomplice,[FN2] the additional trial evidence amply corroborated her testimony. The above-described proof, including the evidence obtained by means of cell phone records, cell site location data, license plate readers, surveillance cameras and eavesdropping warrants, provided far more than the "slim corroborative linkage" necessary to sustain the People's burden of providing legally sufficient evidence to support each element of the charged crimes (People v Breland, 83 NY2d 286, 294 [1994]; accord People v Malak, 117 AD3d 1170, 1174 [3d Dept 2014], lv denied 24 NY3d 1086 [2014]; see People v Jones, 215 AD3d at 1129; People v Davis, 200 AD3d 1200, 1203 [3d Dept 2021]; People v Heimroth, 181 AD3d 967, 969 [3d Dept 2020], lv denied 35 NY3d 1027 [2020]).
Turning to the weight of the evidence, a different verdict would not have been unreasonable had the jury chosen to disbelieve the testimony of the girlfriend, who admitted that, in exchange for testifying, the District Attorney had paid her relocation expenses of approximately $1,000 and [*5]promised not to prosecute her for any role she played in the crimes. Nevertheless, deferring to the jury's credibility determinations, we conclude that the verdict is supported by the weight of the evidence (see People v Slivienski, 204 AD3d 1228, 1235 [3d Dept 2022], lv denied 38 NY3d 1136 [2022]; People v Davis, 200 AD3d at 1203; People v Heimroth, 181 AD3d at 969).
Defendant's contention that a circumstantial evidence charge was warranted is unpreserved for appellate review (see People v Drumgold, 206 AD3d 1044, 1047-1048 [3d Dept 2022], lv denied 38 NY3d 1150 [2022]) and, in any event, lacks merit. His statements to the girlfriend could reasonably be interpreted as admissions of guilt, such that they constitute direct evidence, thereby obviating the need for a circumstantial evidence instruction (see People v Rosner, 67 NY2d 290, 295 [1986]; People v Ash, 162 AD3d 1318, 1322 [3d Dept 2018], lv denied 32 NY3d 1002 [2018]; People v Barnes, 162 AD2d 1039, 1040 [4th Dept 1990], lv denied 76 NY2d 890 [1990]; People v Emery, 159 AD2d 992, 992 [4th Dept 1990], lv denied 76 NY2d 787 [1990]). Furthermore, even accepting for argument's sake defendant's claim that his statements to the girlfriend should be characterized as circumstantial because he did not specifically identify the victim, we note that any error in not giving the circumstantial evidence charge would be harmless given that the trial evidence "was overwhelming and there simply was no reasonable possibility, let alone significant probability[,] that the jury would have acquitted here if the circumstantial evidence charge had been given" (People v Hilton, 185 AD3d 1147, 1151 [3d Dept 2020] [internal quotation marks, brackets and citation omitted], lv denied 35 NY3d 1095 [2020]).
Defendant's related argument that he received ineffective assistance of counsel by virtue of his trial attorney neglecting to request a circumstantial evidence charge is unpersuasive, as counsel will not be faulted for failing to make an application that has little or no chance of success (see People v Bonaparte, 196 AD3d 866, 870 [3d Dept 2021], lv denied 37 NY3d 1025 [2021]; People v Sabines, 121 AD3d 1409, 1412 [3d Dept 2014], lv denied 25 NY3d 1171 [2015]). Regarding defendant's remaining contentions, including his other claims of ineffective assistance as well as his claim centering on hearsay, we have reviewed them and find them to be without merit.
Pritzker, J.P., Reynolds Fitzgerald, McShan and Mackey, JJ., concur.
ORDERED that the judgment is affirmed.

Footnotes

Footnote 1: Lall was also charged with life settlement fraud in the second degree.

Footnote 2: In its final jury charge, County Court gave the jury an accomplice in fact instruction (see CPL 60.22).