People v Butts (2025 NY Slip Op 07041)

People v Butts

2025 NY Slip Op 07041

Decided on December 18, 2025

Appellate Division, Third Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered:December 18, 2025

112910
[*1]The People of the State of New York, Respondent,
vJalil A. Butts, Also Known as J-Dot, Appellant.

Calendar Date:November 13, 2025

Before:Clark, J.P., Reynolds Fitzgerald, Lynch, Ceresia and Powers, JJ.

Kathy Manley, Selkirk, for appellant, and appellant pro se.
F. Paul Battisti, District Attorney, Binghamton (Mary E. Saitta of counsel), for respondent.

Lynch, J.
Appeal from a judgment of the County Court of Broome County (Kevin Dooley, J.), rendered December 13, 2019, upon a verdict convicting defendant of the crimes of criminal possession of a weapon in the second degree and assault in the second degree.
Defendant was charged by indictment with attempted murder in the second degree, criminal possession of a weapon in the second degree, and assault in the second degree in connection with the March 2019 shooting of his cousin (hereinafter the victim). The People alleged that defendant and Antonio M. Jones, acting in concert with one another, shot the victim with a firearm while intending to shoot another individual. Although defendant and Jones were originally charged separately, County Court granted a motion to consolidate the indictments. Following a joint jury trial, defendant was acquitted of the attempted murder charge and convicted of the remaining counts.[FN1] He was sentenced to concurrent prison terms of 10 years, to be followed by five years of postrelease supervision, on the possession charge and five years, to be followed by three years of postrelease supervision, on the assault charge. Defendant appeals.[FN2]
Arguing that there was no competent proof that he possessed the gun used in the shooting or had the state of mind necessary to be found guilty of assault, defendant challenges the verdict as legally insufficient and against the weight of the evidence. We disagree and conclude that defendant could be found guilty of these crimes under a theory of accomplice liability (see Penal Law § 20.00). As charged in the indictment, "[a] person is guilty of criminal possession of a weapon in the second degree when . . . such person possesses any loaded firearm" outside of his or her place of business or home (Penal Law § 265.03 [3]). The possession may be actual or constructive — "the latter of which requires proof that the defendant exercised dominion or control over the property by a sufficient level of control over the area in which the weapon is found" (People v Bryant, 200 AD3d 1483, 1486 [3d Dept 2021] [internal quotation marks, brackets and citations omitted], appeal dismissed 38 NY3d 1158 [2022]), or "over the person from whom the [weapon] is seized" (People v Manini, 79 NY2d 561, 573 [1992]). "A person is guilty of assault in the second degree when . . . [w]ith intent to cause physical injury to another person, he [or she] causes such injury to such other person or to a third person by means of a deadly weapon or a dangerous instrument" (Penal Law § 120.05 [2]). "Since there is no legal distinction between criminal liability as a principal or as an accessory to a crime, when one person engages in conduct which constitutes an offense, another person is criminally liable for such conduct when, acting the with mental culpability required for the commission thereof, he or she solicits, requests, commands, importunes, or intentionally aids such person to engage in such conduct" (People v Rivera, 212 AD3d [*2]942, 945 [3d Dept 2023] [internal quotation marks and citations omitted], lv denied 39 NY3d 1113 [2023]; see People v Williams, 179 AD3d 1502, 1502 [4th Dept 2020], lv denied 35 NY3d 995 [2020]; People v James, 176 AD3d 1492, 1493 [3d Dept 2019], lv denied 34 NY3d 1078 [2019]). Under CPL 60.22 (1), "[a] defendant may not be convicted of any offense upon the testimony of an accomplice unsupported by corroborative evidence tending to connect the defendant with the commission of such offense."
At trial, the People proceeded upon an acting-in-concert theory against defendant and Jones, taking no position as to who was the principal actor in the shooting. The victim testified that, on the evening of March 16, 2019, she attended defendant's performance at a music venue called The Cave in the City of Binghamton, Broome County. Keshawn Revis, the victim's family friend who was "like [a] cousin," was also present. The victim was at the venue for approximately three hours until security guards cleared the building around 2:30 a.m. the next morning. Although the victim did not observe any altercations, she believed one had occurred due to the prompt manner in which the venue was cleared. After leaving, the victim went to her friend's house, where Revis picked her up in a sedan. While Revis was driving the victim to her sister's house, he indicated that there was someone following his car. The victim, who was in the front passenger seat at the time, explained that the vehicle following them — later identified as a sport utility vehicle (hereinafter SUV) — parked behind Revis' sedan after he stopped on Chenango Street. The next memory the victim had was being shot in the left arm as she "reached for the door handle to get out [of Revis'] car." The victim did not see who was inside the SUV nor did she hear anyone say anything prior to being shot. The victim was taken to the hospital where she was treated for injuries to her left arm. A bullet fragment was found in the sleeve of her jacket and a bullet hole was located on the driver side door of Revis' vehicle.
During their investigation, police officers obtained surveillance video from a building on Chenango Street depicting the incident from a distance. Consistent with the victim's testimony, the video shows a sedan driving down Chenango Street during the early morning hours of March 17, 2019, with an SUV following closely behind. When the sedan pulls over to the curb, the SUV parks behind it. After approximately 30 seconds, the SUV then pulls alongside the driver side door of the sedan, stops for a couple of seconds, then quickly drives off. Although no shooting can be seen in the video, as the SUV drives off, an individual can be seen falling out of the passenger side door of the sedan. Police officers identified the SUV depicted in the video as a Chevy Equinox registered to an individual residing in the Village of Bainbridge, Chenango County. Upon making contact with the registrant, he directed police to [*3]his daughter (hereinafter witness 1), who gave a statement implicating defendant and Jones in the shooting.
At trial, witness 1 testified that she was with defendant and Jones at their apartment before their performance at The Cave. She recalled that, approximately a week before the event, Jones expressed a concern about attending because he "knew that people were going to be there that didn't like him." Nevertheless, he ultimately decided to go and witness 1 drove him and another individual (hereinafter witness 2) to the venue in the SUV. Defendant proceeded to the venue separately. When witness 1 dropped Jones off, he "handed [her] his gun" — which she described as "silver and small" with "the thing that spins in it" — and told her to hold on to it until after the event. Witness 1 put the gun in the console of the SUV and then fell asleep. A few hours later, Jones and another individual (hereinafter witness 3) — whom witness 1 did not know — returned to the SUV, with Jones getting into the rear middle seat and witness 3 sitting behind the driver's seat. Upon returning, witness 1 gave Jones back the gun. The group then picked defendant up down the road, who got into the back passenger seat. Witness 1 testified that, when defendant entered the SUV, he was agitated and upset, informing them that he had been punched in the face. According to witness 1, defendant asked Jones for his gun five or six times while in the vehicle, but Jones did not want to give it to him. At some point, a Ford Fusion drove by and the passengers in that vehicle started antagonizing defendant. Witness 1 testified that someone sitting in the back of the SUV told her to follow the Ford, but she could not identify who gave this directive. Although witness 1 followed the Ford for some time, she eventually stopped pursuing it. Thereafter, defendant and Jones spotted another car that "[t]hey wanted [her] to follow." Witness 1 obliged and followed the car onto Chenango Street. Witness 1 testified that, when the car pulled over, "they" — referring to defendant and Jones — told her to park behind the vehicle, which she did. Thereafter, either defendant or Jones told her to pull up next to the car, and, when she did, she heard "[s]omeone . . . [say] something to the other person in the other car and then gunshot[s] went off." Witness 1 thought it was defendant who "said something" in this regard. Witness 1 testified that either defendant or Jones told her to drive away and she heard a girl scream as she did so. When witness 1 drove Jones to Connecticut later that day, he stated that defendant's cousin had been shot.
Witness 2 also gave testimony implicating defendant in the shooting. Witness 2 was present at defendant and Jones' residence before their performance at The Cave and recalled them having a conversation about bringing a gun to the performance. After the performance, Jones got back into the SUV with witness 3 and they picked defendant up separately. Witness 2 also recalled [*4]defendant being angry when he entered the SUV and testified that he and Jones were mad and "wanted to find people." In that regard, witness 2 testified that someone in the back seat of the SUV gave directions to witness 1 to follow a car. Witness 2 remembered pulling up next to one of the cars they were following, after which the rear passenger window of the SUV rolled down and someone asked, "Do you know what this is about"? Witness 2 then heard a gunshot go off behind her. She revealed that, after the shooting, defendant asked the group not to say anything.
As for the physical evidence in this case, no firearm or shell casings were recovered and the bullet fragments obtained from the scene were too deformed to identify the type of gun used. However, the People elicited testimony that the lack of shell casings was consistent with a shot from a revolver and entered into evidence a video that had been posted to YouTube depicting Jones rapping with a revolver in his hand. Witness 1 testified that the gun Jones handed her on the evening in question looked like the one depicted in this video.
Defendant asserts that "[t]here was no way to determine what gun was used to shoot into [Revis'] car and wound [the victim]," positing that witness 3 could have fired the shots. However, defense counsel proffered this theory to the jury on summation, which the jury implicitly rejected through its conviction of defendant and Jones. There was no evidence that witness 3, who was sitting behind the driver's seat of the SUV, even possessed a gun. Rather, Jones was the only individual identified with a gun and only defendant and Jones were implicated in directing witness 1 to follow Revis' vehicle. On this record, the jury could readily conclude that the shots were fired from Jones' gun and that either he or defendant was the shooter, not witness 3.
We reject defendant's assertion that witness 1's testimony was insufficiently corroborated under CPL 60.22 and, therefore, could not be used to obtain a conviction against him. "[T]he corroborative evidence need not establish all the elements of the offense" and "need not be powerful in itself" (People v Jones, 215 AD3d 1123, 1128-1129 [3d Dept 2023] [internal quotation marks and citations omitted], lv denied 40 NY3d 935 [2023]). Although witness 1 was deemed an accomplice by County Court, her testimony against defendant was sufficiently corroborated by the testimony of witness 2 and the surveillance video. Witness 2 confirmed defendant's presence in the SUV, that he was angry due to an altercation at The Cave, that both he and Jones were seated in the back seat, that the back seat passengers directed witness 1 to follow the vehicle in which the victim was a passenger and then pull up alongside that vehicle, and that a shooting occurred. The surveillance video confirmed that the SUV in which defendant was a passenger followed and pulled alongside the victim's vehicle. This testimony and video evidence was consistent with [*5]witness 1's testimony and served "to connect . . . defendant with the commission of the crime in such a way as may reasonably satisfy the jury that [witness 1 was] telling the truth" (People v Reome, 15 NY3d 188, 192 [2010] [internal quotation marks and citation omitted]; accord People v Jones, 215 AD3d at 1128-1129).
Although there was no direct proof that defendant fired the shots into Revis' sedan and no witness actually observed him with Jones' gun on the evening in question, we conclude that he could still be found guilty of the possession charge as an accomplice.
" 'Accessorial liability does not require that [an accomplice] either possess or have control over the weapon, or that he or she give it to the person who uses it, or even that he or she importunes its use aloud' " (People v James, 176 AD3d at 1493 [ellipsis and brackets omitted], quoting Matter of Tatiana N., 73 AD3d 186, 190 [1st Dept 2010]). To the extent defendant was not the shooter,[FN3] "[t]he People were instead required to prove that defendant knew that [Jones] possessed the weapon and 'shared the state of mind required for the commission of th[e] offense, intentionally aiding [Jones] in such conduct and sharing a "community of purpose" with him' " (People v James, 176 AD3d at 1493, quoting Matter of Tatiana N., 73 AD3d at 191). Although defendant proceeded to The Cave separately from Jones, there was testimony that he spoke with Jones about bringing a gun to the venue. The evidence established that defendant knew Jones had a gun once the two got back into the SUV after the performance, asking for it five or six times. Defendant was noticeably angry at the time, having gotten into an altercation. Witnesses 1 and 2 both indicated that defendant participated in giving directions to follow Revis' sedan, and the rear passenger side window of the SUV — where defendant was sitting — rolled down upon pulling next to the driver side of the sedan before the shots were fired. This sequence of events, showing a deliberative plan to follow the sedan, culminating in the shooting once the vehicle stopped, reveals a community of purpose between defendant and Jones to commit the offense, comparable to the stalking of the victims in People v James (176 AD3d at 1494). The evidence would in no way support an assertion that the shooting was spontaneous (compare People v Monaco, 14 NY2d 43, 45 [1964]). There was also testimony that defendant told the occupants of the SUV not to say anything after the shooting, indicating his consciousness of guilt. Considering the testimony regarding defendant's conduct and demeanor on the night in question, and other evidence placing him at or near the scene, in a light most favorable to the People, we readily conclude that the convictions are supported by legally sufficient evidence (see People v Guevara,240 AD3d 1083, 1085 [3d Dept 2025]). Further, when viewing this evidence in a neutral light and considering the "relative probative force of the conflicting testimony [*6]and evidence, as well as the relative strength of the conflicting inferences to be drawn therefrom," we conclude that the People proved defendant's guilt as an accomplice on the weapon possession charge beyond a reasonable doubt (People v Sanchez, 32 NY3d 1021, 1022 [2018] [internal quotation marks and citation omitted]; see People v James, 176 AD3d at 1493-1494). The same is true of the assault conviction. Even assuming, without deciding, that defendant was not the shooter, the testimony regarding his demeanor and conduct before, during and after the incident was sufficient to conclude beyond a reasonable doubt that he shared an intent to cause physical injury to another person by means of a deadly weapon and intentionally aided in doing so (see Penal Law § 120.05 [2]).
We also reject defendant's contention that County Court erred in declining to give a missing witness charge relative to Revis. "A missing witness charge allows a factfinder to draw an unfavorable inference based on a party's failure to call a witness who would normally be expected to support that party's version of events" (People v Dennis, 221 AD3d 1278, 1281 [3d Dept 2023] [internal quotation marks, brackets and citations omitted], lv denied 40 NY3d 1091 [2024]). "To establish the need for a missing witness charge, the proponent of the charge must demonstrate that (1) the witness's knowledge is material to the trial; (2) the witness is expected to give noncumulative testimony; (3) the witness is under the control of the party against whom the charge is sought, so that the witness would be expected to testify in that party's favor; and (4) the witness is available to that party" (People v Lorenz, 211 AD3d 1109, 1112 [3d Dept 2022] [internal quotation marks and citations omitted], lv denied 39 NY3d 1112 [2023]; see People v Martinez, 166 AD3d 1292, 1296 [3d Dept 2018], lv denied 32 NY3d 1207 [2019]). This Court "will only disturb a trial court's determination on whether to grant a missing witness charge if the court abused its discretion" (People v Onyia, 70 AD3d 1202, 1204 [3d Dept 2010]; see People v Lawing, 119 AD3d 1149, 1150 [3d Dept 2014], lv denied 24 NY3d 1121 [2015]).
In opposition to defense counsel's request for a missing witness charge during the charge conference, the prosecutor emphasized that Revis would not be expected to provide material testimony, revealing that he had been interviewed during the underlying police investigation and could not identify the shooter or the make and model of the SUV. Revis also confirmed his lack of knowledge about the shooter's identity when he testified before the grand jury. Although defense counsel maintained that Revis was expected to testify regarding his close relationship with defendant — a matter that other witnesses did not have direct knowledge of and which was relevant to defendant's intent to harm Revis — such testimony would have been favorable to defendant, not the People (see generally People v Smith, 33 NY3d 454, 458[*7][2019]). Even assuming that Revis was available to the People and within their control and that he would have provided material, noncumulative testimony, there was no showing that the testimony would be favorable to the prosecution. Accordingly, we find no abuse of discretion in County Court's denial of defendant's request for a missing witness charge (see People v Dennis, 221 AD3d at 1281; People v Decker, 218 AD3d 1026, 1042 [3d Dept 2023], lv denied 40 NY3d 1012 [2023]).
Defendant's remaining contentions do not warrant extended discussion. First, County Court was not required to hold a Wade hearing regarding witness 1's identification of defendant in a photo array. Witness 1 testified before the grand jury that she had known defendant for several years and saw him "[p]robably every day." Thus, to the extent defendant alleges that the photo array was unduly suggestive, the witness was "so familiar with the defendant that there [was] little or no risk that police suggestion could lead to a misidentification" (People v Casanova, 119 AD3d 976, 980 [3d Dept 2014] [internal quotation marks and citations omitted]; see People v Smith,137 AD3d 1323, 1326-1327 [3d Dept 2016], lv denied 28 NY3d 974 [2016]). Next, as defendant concedes, his argument that County Court erred in declining to give a circumstantial evidence charge is unpreserved (see People v Hilton, 185 AD3d 1147, 1151 [3d Dept 2020], lv denied 35 NY3d 1095 [2020]) and, in any event, lacks merit. "[A] trial court must grant a defendant's request for a circumstantial evidence charge when the proof of the defendant's guilt rests solely on circumstantial evidence" (People v Hardy,26 NY3d 245, 249 [2015] [emphasis added]). Where, as here, the People's case is premised on both direct and circumstantial evidence, a circumstantial evidence charge is not required (see People v Roldan, 88 NY2d 826, 827 [1996]; see People v Guevara,240 AD3d at 1088-1089).[FN4] For this reason, defendant's related argument that his trial attorney was ineffective for failing to request a circumstantial evidence charge is unpersuasive, "as counsel will not be faulted for failing to make an application that has little or no chance of success" (People v Luna,228 AD3d 1061, 1067 [3d Dept 2024], lv denied 42 NY3d 971 [2024]). Defendant's claim of prosecutorial misconduct directed at certain statements made by the prosecutor on summation is similarly unpreserved, as defendant did not object to the challenged statements. Finally, we deny defendant's request to reduce the sentence in the interest of justice. Although we recognize that defendant has no prior criminal history, after considering all relevant facts and circumstances, we do not find the sentence imposed to be unduly harsh or severe (see CPL 470.15 [6] [b]).
To the extent not explicitly addressed herein, we have examined defendant's remaining contentions and find them to be unpreserved or without merit.
Clark, J.P., Reynolds Fitzgerald, Ceresia and Powers, JJ., concur[*8].
ORDERED that the judgment is affirmed.

Footnotes

Footnote 1: The same verdict was returned against Jones.
Footnote 2: This Court issued a decision affirming the judgment of conviction in April 2024 (226 AD3d 1089 [3d Dept 2024]). However, that decision was vacated after it was discovered that the attorney who argued the appeal on behalf of the People had "personal and substantial" involvement in this matter as a law clerk to the trial court judge (229 AD3d 856, 857 [3d Dept 2024]). We remitted the matter to County Court for expeditious appointment of a special prosecutor, and this appeal was restored to this Court's calendar. 

Footnote 3: We make no determination in this regard.

Footnote 4: "Direct evidence is evidence of a fact based on a witness's personal knowledge or observation of that fact" (People v Taylor, 196 AD3d 851, 854 [3d Dept 2021] [internal quotation marks and citation omitted], lv denied 37 NY3d 1030 [2021]). While there was no direct proof that defendant shot into Revis' vehicle or actually possessed the weapon, certain witness testimony, if believed, established that defendant acted as an accessory to the charged crimes (see People v Roldan,88 NY2d at 827). Witnesses testified that defendant and Jones discussed bringing the gun to the venue, that Jones did, in fact, bring a gun to the venue, and that defendant repeatedly insisted that Jones give him the gun. Thus, at the very least, the People proved, via direct evidence, that "defendant knew that [Jones] possessed the weapon" (People v James,176 AD3d at 1493).